48 A.3d 1031

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. J.D., DEFENDANT–APPELLANT.

Argued May 8, 2012—Decided August 9, 2012.

348

*Jay L. Wilensky,* Assistant Deputy Public Defender, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney); *J.D.* submitted a brief pro se.

*Stephanie Davis Elson,* Assistant Prosecutor, argued the cause for respondent (*Edward J. DeFazio,* Hudson County Prosecutor, attorney; *Gina Giordano,* Assistant Prosecutor, on the brief).

*Hillary K. Horton,* Deputy Attorney General, argued the cause for amicus curiae The Attorney General of New Jersey (*Jeffrey S. Chiesa,* Attorney General, attorney).

JUDGE WEFING (temporarily assigned) delivered the opinion of the Court.

In this appeal, we are again called upon to balance the exquisite tension that inheres in protecting a defendant's right to challenge the individual accusing him of a crime while at the same time protecting the victim of a sexual assault from unjustified incursions into past conduct. Defendant, who was convicted at trial of sexual assault, *N.J.S.A.* 2C:14–2(c), and endangering the welfare of a child, *N.J.S.A.* 2C:24–4(a), argues that the trial court and the Appellate Division, which affirmed his convictions and sentence, struck the wrong balance, depriving him of a fair trial. We are unable to agree and thus affirm defendant's conviction and sentence.

I.

The victim, K.E., was born on April 19, 1990. Her mother was unable to care for K.E. for an extended period of time, and thus K.E.'s grandmother, a resident of Jersey City, had custody of the child. K.E. would often spend significant periods of time with C.D., a childhood friend of K.E.'s mother, and C.D.'s husband, defendant J.D. Eventually, K.E. asked C.D. and J.D. to be her godparents, and they agreed. K.E. became close friends with their daughter, A.D., who was approximately six years younger than K.E. The two young girls regularly slept together in the same bed at defendant's home in Jersey City.

At the end of August 2005, K.E. stayed with C.D. and J.D., at which point K.E. was fifteen years of age. When she awoke on the morning of August 30, one of her eyes was swollen from mosquito bites; and C.D. called K.E.'s mother, who was living in New York City, to tell her of this. K.E.'s mother took the train to Jersey City, where K.E., C.D., and A.D. picked her up at the train station and took her and K.E. to see K.E.'s grandmother. K.E.'s mother was speaking privately with her daughter when she saw a red mark on the girl's neck. K.E.'s mother testified that when she questioned K.E. about it, K.E. became upset, but K.E. would not tell her anything. K.E. told her that she would speak to her grandmother, and K.E.'s mother left to give her that opportunity. K.E. confided to her grandmother that defendant had given her that mark and had assaulted her. K.E.'s grandmother telephoned K.E.'s mother, who immediately returned and called the police.

K.E. said that defendant had repeatedly sexually assaulted her. She said that defendant attacked her, between the ages of ten and twelve, by digitally penetrating her while A.D. was asleep next to her. K.E. stated that when she was twelve or thirteen, J.D. began to have sexual intercourse with her.

Regarding the August 29 incident, K.E. said that J.D. had awakened her at approximately 1:00 a.m. and told her to go downstairs where he kissed her, removed her underwear, and proceeded to have intercourse with her. She said that he did not

ejaculate into her vagina but onto her buttocks. When the assault ended, she returned to bed. She said nothing further occurred between them, and she woke up the next day with the swollen eye.

The police officer who responded to the apartment of K.E.'s grandmother contacted the Sexual Assault Victims' Assistance Unit of the Hudson County Prosecutor's Office and was instructed to take K.E. to the hospital, where K.E. was met by members of the Sexual Assault Response Team. At the hospital, she was examined by a physician, who testified at trial that he observed a superficial abrasion of K.E.'s posterior fourchette, a finding that was consistent with penetration. He also took swabs from K.E.'s vagina, cervix, and mouth.

The following day, August 30, Detective Maria Dargon, a member of the Sexual Assault Response Team, took a formal taped statement from K.E. K.E. told Detective Dargon that she had previously told C.D. that J.D. was abusing her and had also told her best friend, L.M. In her statement, K.E. said her only sexual experience was the abuse she received from defendant. Defendant was arrested that same day. He vigorously denied any sexual abuse although he admitted that, at times, he kissed K.E. or bit her in what he described as a "playful manner." The police took a buccal swab from J.D. for DNA comparison purposes.

Because L.M. was away on vacation when K.E. disclosed to authorities that J.D. had been abusing her, Detective Dargon was not able to interview her until the middle of September. In her statement, L.M. denied that K.E. had told her that defendant had had sex with her. L.M. said, however, that sometimes she and K.E. bit each other playfully.

L.M.'s trial testimony was not consistent with the statement she gave to Detective Dargon. At trial, L.M. testified that K.E. had told her many times that J.D. was having sex with her. L.M. said she did not tell this to Detective Dargon because she was nervous and scared. She admitted that she and K.E. kissed and bit each other "all the time" and said that she was the person who left the red mark K.E.'s mother saw on the girl's neck.

The swabs taken from K.E. during her examination at the hospital were forwarded to the New Jersey State Police for testing, which revealed both K.E.'s DNA and the presence of sperm. The samples, however, did not contain enough sperm to permit the State Police laboratory to conduct a DNA analysis of them. The State Police laboratory sent the swabs to a private laboratory, Bode Technology, which had the technical capability to perform short tandem repeat analysis of the Y chromosome contained in that sperm. The process involves isolating the Y chromosome that was present in the sample and then analyzing the genetic sequence present in that Y chromosome. Y chromosome short tandem repeat analysis cannot precisely identify the source of a DNA sample; it can only be used to exclude a particular individual as the source of the sample.

Defendant did not challenge the reliability of Y chromosome short tandem repeat analysis. The trial court conducted a *Frye* hearing, *Frye v. United States*, 293 *F*. 1013 (D.C.Cir.1923); *State v. Harvey*, 151 *N.J.* 117, 169–70, 699 *A.*2d 596 (1997), and found the procedure reliable, a result reached by other courts. *See United States v. Ewell*, 252 *F.Supp.*2d 104, 111–15 (D.N.J.2003); *State v. Deloatch*, 354 *N.J.Super.* 76, 91, 804 *A.*2d 604 (Law Div.2002).

The Y chromosome short tandem repeat testing performed at Bode Technology did not exclude defendant as the source of the sperm found in the swabs taken from K.E. In fact, the State presented evidence at trial that the Y chromosome profile of the sperm found on those swabs was consistent with defendant's Y chromosome profile.[1] Defendant's expert testified that 5.99% of the total male population in the United States, or 7.58% of African–American males, would also have that same Y chromosome profile. The expert calculated that approximately ten mil-

---

[1] We note that the State presented its DNA evidence through the testimony of the vice president of forensic operations of Bode Technology, rather than the analyst who performed the actual testing. Defendant has not challenged that evidentiary procedure.

lion males living in the United States would have that same profile. Defendant was unable to complete his own DNA tests because the samples were entirely consumed in the testing that had been performed by the State's experts.

## II.

Defendant was indicted in November 2005. He was charged with two counts of first-degree aggravated sexual assault, *N.J.S.A.* 2C:14-2(a)(1); four counts of second-degree endangering the welfare of a child, *N.J.S.A.* 2C:24-4(a); four counts of fourth-degree child abuse, *N.J.S.A.* 9:6-1, 6-3; and two counts of second-degree sexual assault, *N.J.S.A.* 2C:14-2(c). Defendant's wife, C.D., was named in the same indictment and charged with two counts of child abuse, *N.J.S.A.* 9:6-1, 6-3, and *N.J.S.A.* 2C:24-4(a) for failing to report K.E.'s allegations of sexual abuse against defendant.

The trial court held a number of pretrial hearings. At the hearings, defendant's attorney mentioned on several occasions that he would attempt to establish at trial that another male was the source of the male DNA that had been identified during the Y chromosome short tandem repeat testing. In response to defense counsel's statements, the trial court consistently advised defense counsel of the necessity of complying with the requirements of the Rape Shield Law, *N.J.S.A.* 2C:14-7, before any evidence of K.E.'s prior sexual conduct could be admitted. Because defense counsel was unable to present, either in advance of trial or during the trial itself, any evidence that complied with *N.J.S.A.* 2C:14-7, the trial court precluded him from raising the issue of K.E.'s prior sexual conduct.

Defendant was convicted of one count of sexual assault and one count of endangering the welfare of a child and acquitted of the balance of the charges. C.D. was acquitted of the charges of child abuse. Defendant filed a motion for a new trial in which he argued that the trial court improperly restricted him from presenting the issue of K.E.'s sexual activity to the jury. The trial court denied defendant's motion and sentenced him to nine years

in prison for the sexual assault conviction and a concurrent seven years in prison for the endangerment conviction. The trial court did not impose any period of parole ineligibility.

Defendant appealed, contending that *N.J.S.A.* 2C:14-7 was not applicable because he sought to address not whether K.E. had engaged in sexual activity prior to the incident of August 29, 2005, but whether she had engaged in sexual activity between J.D.'s alleged assault upon her and her report of the attack to her grandmother. He also argued that even if *N.J.S.A.* 2C:14-7 were applicable, evidence of K.E.'s sexual activity was admissible to challenge her credibility. The Appellate Division rejected defendant's arguments in an unpublished opinion. It concluded that none of the issues which defendant highlighted on appeal were relevant under *N.J.S.A.* 2C:14-7. It noted that J.D. had proffered no evidence K.E. had been sexually active during the relevant time period and offered nothing other than what it characterized as "general and vague innuendos."

This Court granted certification, "limited to the issue of whether the trial court erred in denying admission of evidence that the victim was sexually active under the Rape Shield Law, *N.J.S.A.* 2C:14-7." *State v. J.D.*, 208 *N.J.* 382, 30 *A.*3d 319 (2011). We also granted the motion of the Attorney General to appear as amicus curiae.

## III.

Defendant argues that the manner in which the trial court and the Appellate Division applied *N.J.S.A.* 2C:14-7 deprived him of a fair trial. He contends that K.E. provided a sworn statement to Detective Dargon in which she said she was not sexually active and that he should have been entitled to impeach her credibility with respect to that statement. He asserts that the trial court's refusal to permit him to do so violated his constitutional right to confront his accuser. Defendant stresses that this restriction was particularly harmful in light of the nature of the DNA results, which demonstrates only that he, together with more than ten

million males in the United States, was a potential source of the male DNA obtained from K.E.'s vaginal and cervical swabs.

The State counters defendant's arguments. It asserts that defendant's approach would eviscerate all the procedural protections afforded to victims of sexual assaults under *N.J.S.A.* 2C:14–7. It notes that despite the many opportunities the trial court afforded defendant, he failed to present anything beyond vague allegations regarding K.E.'s sexual activity. It asserts that the trial court was entirely justified in precluding defendant from presenting such vague material.

Amicus Attorney General stresses that defendant failed to follow the procedural steps outlined in *N.J.S.A.* 2C:14–7, despite the fact that the trial court afforded him many opportunities to do so. He argues that the vague allegations defendant put forth amounted to no more than an assault on K.E.'s character and are exactly the type of allegations the statute is aimed at precluding.

## IV.

### A.

We first note the standard that governs our review of the parties' arguments. To the extent defendant's argument rests upon the correct interpretation of *N.J.S.A.* 2C:14–7, he raises a question of law, and our review is de novo and plenary. *State v. Gandhi*, 201 *N.J.* 161, 176, 989 *A.*2d 256 (2010). To the extent defendant is challenging evidentiary rulings by the trial court, we review those rulings to determine whether the trial court abused its discretion. *State v. Brown*, 170 *N.J.* 138, 147, 784 *A.*2d 1244 (2001); *State v. Marrero*, 148 *N.J.* 469, 483–84, 691 *A.*2d 293 (1997). A trial court's decision to grant or deny an evidentiary application will generally be upheld unless it is " 'so wide of the mark' " as to result in a manifest injustice. *Brown, supra,* 170 *N.J.* at 147, 784 *A.*2d 1244 (quoting Marrero, *supra,* 148 *N.J.* at 484, 691 *A.*2d 293).

## B.

 *N.J.S.A.* 2C:14–7, commonly referred to as the Rape Shield Law, was enacted in 1978 to "place[ ] restrictions on a defendant's ability to introduce evidence of the rape victim's past sexual conduct." Assembly Judiciary, Law and Public Safety Committee, *Statement to Assembly Bill No. 677*, at 1 (Jan. 20, 1994) *reprinted in N.J.S.A.* 2C:14–7 (2005). The statute's purpose " 'is to protect the privacy interests of the victim while ensuring a fair determination of the issues bearing on the guilt or innocence of the defendant.' " *State v. P.S.,* 202 *N.J.* 232, 261, 997 *A.*2d 163 (2010) (quoting *State v. Garron,* 177 *N.J.* 147, 165, 827 *A.*2d 243 (2003), *cert. denied,* 540 *U.S.* 1160, 124 *S.Ct.* 1169, 157 *L.Ed.*2d 1204 (2004)). It "is designed to 'deter the unwarranted and unscrupulous foraging for character-assassination information about the victim' and 'does not permit introduction of evidence of the victim's past sexual conduct to cast the victim as promiscuous or of low moral character.' " *State v. Schnabel,* 196 *N.J.* 116, 128, 952 *A.*2d 452 (2008) (quoting *Garron, supra,* 177 *N.J.* at 165, 827 *A.*2d 243).

The statute defines "sexual conduct" as "any conduct or behavior relating to sexual activities of the victim, including but not limited to previous or subsequent experience of sexual penetration or sexual contact, use of contraceptives, sexual activities reflected in gynecological records, living arrangement and life style." *N.J.S.A.* 2C:14–7(f).

It sets forth in detail the procedure a defendant must follow if he wishes to introduce evidence of such conduct on the part of the victim. *N.J.S.A.* 2C:14–7(a) provides that such a defendant "must apply for an order of the court before the trial or preliminary hearing[.]" The statute provides a limited safety valve under which such an application may be presented while the trial is in progress "if the court determines that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence." *Ibid.*

The statute directs that the trial court, upon receipt of such an application, "shall conduct a hearing in camera" to determine if the evidence is admissible. Further, in the statute, the Legislature laid out the test to be employed when a trial court considers whether the proffered evidence should be admitted at trial: it must be "relevant and highly material" and its "probative value [must] ... substantially outweigh[ ] its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim[.]" *Ibid.*

Further, under the statute, the evidence is only relevant if "it is material to proving the source of semen, pregnancy or disease[,]" *N.J.S.A.* 2C:14–7(c), or "if it is probative of whether a reasonable person, knowing what the defendant knew at the time of the alleged offense, would have believed that the alleged victim freely and affirmatively" consented. *N.J.S.A.* 2C:14–7(d). If the trial court is satisfied at the conclusion of the in camera proceeding that the proffered evidence fairly fits within those statutory parameters, it "shall enter an order setting forth with specificity what evidence may be introduced and the nature of the questions which shall be permitted, and the reasons why the court finds that such evidence satisfies" the statutory standards. *N.J.S.A.* 2C:14–7(a).

■ The Rape Shield Law lays out the procedure in detail to avoid surprise during the trial and because of "the necessity of providing the judge with sufficient information so that he or she can decide if the rigorous requirements of the statute have been met." *State v. Rowe,* 316 *N.J.Super.* 425, 434, 720 *A.2d* 612 (App.Div.1998), *certif. denied,* 160 *N.J.* 89, 733 *A.2d* 494 (1999). If the trial court is to be able to make that determination, it "must have details, not vague allegations." *Id.* at 435, 720 *A.2d* 612.

■ Our case law has recognized that a literal interpretation and application of the statute's mandate could impinge on a defendant's right of confrontation, guaranteed both under the federal and state constitutions. *U.S. Const.* amend. VI; *N.J.*

*Const.* art. I, ¶ 10. "Among the primary interests protected by the right of confrontation [is] the opportunity for defendants to face their accusers and to cross-examine the state's witnesses. . . . [T]he right of confrontation guarantees criminal defendants a meaningful opportunity to present a complete defense." *State v. Budis,* 125 *N.J.* 519, 530–31, 593 *A.*2d 784 (1991) (internal quotation marks and citations omitted).

This Court in *Garron, supra,* 177 *N.J.* 147, 827 *A.*2d 243, addressed "the tension between defendant's right to confrontation and the compulsory process of witnesses, and the victim's right to be free from an unnecessary invasion of her privacy." *Id.* at 153, 827 *A.*2d 243. The defendant, charged with aggravated sexual assault, sought to introduce evidence of his past relationship with the victim to further his defense that she had consented to have sexual relations with him. *Ibid.* The trial court permitted the defendant to introduce only a limited amount of the evidence he proffered, and the Appellate Division affirmed. *Id.* at 158–59, 163, 827 *A.*2d 243. This Court, however, reversed. *Id.* at 178–79, 827 *A.*2d 243.

We noted that "[t]he competing state interest served by barring [such] proposed evidence must be 'closely examined' when the denial or significant diminution of the rights of confrontation and compulsory process 'calls into question the ultimate integrity of the fact-finding process.'" *Id.* at 169–70, 827 *A.*2d 243 (quoting *Chambers v. Mississippi,* 410 *U.S.* 284, 295, 93 *S.Ct.* 1038, 1046, 35 *L.Ed.*2d 297, 309 (1973))(citing *Budis, supra,* 125 *N.J.* at 532, 593 *A.*2d 784; Cannel, *New Jersey Criminal Code Annotated,* comment 4 on *N.J.S.A.* 2C:14–7(d) (2003)). We concluded that a literal and mechanistic application of the statute, with its requirements that the proffered evidence be "*highly* material" and that its probative value must "*substantially* " outweigh its prejudicial effect, could not be reconciled with a defendant's constitutional right of confrontation. *Id.* at 172, 827 *A.*2d 243. We did not, however, strike the statute in its entirety. Rather, we ruled that "evidence that is relevant and necessary" may not be excluded

under the statute. *Id.* at 173, 827 *A.*2d 243. We noted that "the admission of [such] evidence is constitutionally compelled." *Id.* at 171, 827 *A.*2d 243 (citations omitted).

Our recognition of a defendant's right to confront the individual accusing him of such conduct did not represent a retreat from the statutory goal of protecting a victim of sexual assault from unwarranted attacks upon her character and behavior. Rather, this Court has recognized the necessity to "balance competing factors to determine when the admission of prior sexual [conduct] is appropriate." *Schnabel, supra,* 196 *N.J.* at 130, 952 *A.*2d 452.

Honoring a defendant's constitutional right of confrontation requires that the relevance of the proffered evidence be measured by a standard broader than the restrictive limits imposed by *N.J.S.A.* 2C:14–7(c) and (d). *See id.* at 129, 952 *A.*2d 452. "[E]vidence of prior sexual conduct that is only material (not highly material) and that only has probative value outweighing (not substantially outweighing) its prejudicial impact" is constitutionally compelled. *Ibid.* For instance, evidence of prior sexual conduct by the victim may be admissible if it provides an alternative source from which the victim gained knowledge about the sexual acts alleged to have occurred. *P.S., supra,* 202 *N.J.* at 261–62, 997 *A.*2d 163; *Budis, supra,* 125 *N.J.* at 534, 593 *A.*2d 784.

The weighing process in which the trial court must engage—balancing the probative value of the proffered evidence against its potential for prejudice—is exquisitely fact-sensitive. The proper balance "depends on the facts of each case." *Budis, supra,* 125 *N.J.* at 533, 593 *A.*2d 784 (discussing two-step process of determining relevancy and weighing probative value against prejudicial effect). The trial court must weigh the relevance of the proffered evidence, its necessity to the defense, and its apparent veracity against its potential to humiliate the victim, invade her privacy, and confuse the jury.

## C.

We turn now to the application of those established principles to the case before us. On at least four occasions the trial court instructed defendant's attorney to submit an application, supported by evidentiary material that would permit it to conduct an in camera hearing under *N.J.S.A.* 2C:14–7(a) and to determine whether that material should be admitted in accordance with the principles we just set forth. Defendant's attorney never did so.

Defendant's attorney advised the trial court that he proposed to have defendant's daughter testify that she had overheard telephone conversations of K.E. in which K.E. allegedly recounted her sexual exploits. He also proposed to have L.M.'s sister testify that K.E. told her about her sexual encounters with at least two males. Defendant admitted that he was unable to produce the name of even one male with whom K.E. had allegedly engaged in sexual conduct. Nor was he able to identify when those alleged sexual encounters had occurred. It is clear that defendant proffers nothing more than the "vague allegations" that we have consistently held are inadmissible and not constitutionally compelled. *Rowe, supra,* 316 *N.J.Super.* at 434, 720 *A.*2d 612; *see also P.S., supra,* 202 *N.J.* at 262, 997 *A.*2d 163. The trial court correctly declined to elevate defendant's vague allegations to a status they did not possess and to which they were not entitled.

Such allegations, moreover, were not relevant to the issue the jury had to decide. Evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401. When K.E. made her allegation against defendant, she was old enough to possess the knowledge that would permit her to describe such conduct even if she had never engaged in sexual relations. *P.S., supra,* 202 *N.J.* at 261–62, 997 *A.*2d 163. Further, whether or not she had previously engaged in sexual activities had no reasonable tendency to prove or disprove that defendant abused her.

Defendant asserted to the trial court that he should be permitted to pursue this avenue to establish that another male was the source of the semen. Evidence that K.E. had engaged in a sexual encounter with another male between the time she said defendant assaulted her and the time of her examination at the hospital would certainly have a tendency in reason to prove that another male was the source of that semen. Defendant's attorney, however, made no such proffer; he sought to introduce statements that K.E. may, at some wholly unidentified earlier point in time, have had a sexual encounter with an unidentified male. Such evidence was not relevant to the charges against defendant.

### D.

For the sake of completeness, we proceed to weigh the probative value of the evidence against its prejudicial value. Defendant asserts that the probative value of his proffer lies in its challenge to K.E.'s credibility when she told the investigating detective that she was not sexually active. We have noted that "[t]he probative value [of evidence] of the prior acts depends on clear proof that they occurred, that the acts are relevant to a material issue in the case, and that they are necessary to the defense." *Budis, supra,* 125 *N.J.* at 533, 593 *A.*2d 784 (citing *State v. Pulizzano,* 155 *Wis.*2d 633, 456 *N.W.*2d 325, 335 (1990)).

As we have set forth, defendant had no clear proof the prior sexual conduct alleged by defendant had occurred, and the alleged conduct was not relevant. The victim's out-of-court statement to which defendant pointed, moreover, was never introduced at defendant's trial. Accordingly, the allegations to which defendant points had no probative value at defendant's trial.

We note in addition that defendant was permitted to present the testimony of K.E.'s friend L.M., who told the jury that she and K.E. often kissed and bit each other. Indeed, L.M. testified that it was she who gave K.E. the red mark K.E.'s mother saw, contradicting K.E.'s testimony that it was defendant.

Defendant also points out the limited value of the DNA evidence established by the Y chromosome short tandem repeat testing. Relying on the fact that such testing could not conclusively identify him as the source of the semen found on the vaginal and cervical swabs, he urges that it is even more important he be permitted to offer proof that K.E. engaged in sexual encounters with other males. The limited nature of DNA evidence was clearly put before the jury by defendant's expert, who explained his statistical conclusions in clear and readily-understandable examples. The jury was free to accept or reject the Y chromosome short tandem repeat testing as evidence that defendant was the source of that semen. It was not necessary for defendant to offer non-specific, irrelevant "evidence" that K.E. was sexually active to suggest that another male was the source of that semen, especially when the Legislature has mandated that courts "'protect the privacy interests of the victim'" by deterring "'the unwarranted and unscrupulous foraging for character-assassination information.'" *P.S.*, *supra*, 202 *N.J.* at 261, 997 *A.*2d 163 (quoting *Garron, supra*, 177 *N.J.* at 165, 827 *A.*2d 243).

## E.

■ We note in closing that the trial court, in regularly telling defendant's attorney to follow the procedure outlined in *N.J.S.A.* 2C:17–7, told the attorney he needed to produce affidavits or certifications to establish the factual legitimacy of his allegations. Although such written statements, sworn or certified to be true, are one method of proceeding, *N.J.S.A.* 2C:14–7 does not contain that specification. It directs the party seeking to introduce such evidence to file a motion to that effect. Clearly, defendant must include within his motion papers a sufficient proffer of the proposed evidence to permit the trial court to determine whether there is a sufficient basis to hold an in camera hearing. Here, defendant's attorney did not do so. The trial court's refusal to permit a defendant to raise this issue at trial, under the purported veil of challenging K.E.'s credibility, was entirely correct.

## V.

Defendant's convictions are affirmed.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS and PATTERSON, and Judge WEFING (temporarily assigned)—6.

*Opposed*—None.