# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1123-14T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ARTHUR E. MORGAN, III,

    Defendant-Appellant.

_____

Submitted January 31, 2017 — Decided  March 21, 2017

Before Judges Yannotti and Gilson.

On appeal from Superior Court of New Jersey,
Law Division, Monmouth County, Indictment No.
12-06-1138.

Joseph E. Krakora, Public Defender, attorney
for appellant (Thomas G. Hand, Designated
Counsel, on the briefs).

Christopher J. Gramiccioni, Monmouth County
Prosecutor, attorney for respondent (Mary R.
Juliano, Assistant Prosecutor, of counsel and
on the brief).

PER CURIAM

    A two-year-old girl was found dead in a stream.  The child
had been strapped into a car seat and the car seat had been

weighted down with a tire jack. An autopsy report concluded that the child had drowned. Just prior to her death, the girl had been in the care of her father, defendant Arthur E. Morgan, III.

A jury convicted defendant of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a); and third-degree interference with custody of a child, N.J.S.A. 2C:13-4(a)(1). The jury also found that defendant committed the murder by his own conduct and that the victim was less than fourteen years old, which is an aggravating factor under N.J.S.A. 2C:11-3(b)(4)(k).

On the murder conviction, defendant was sentenced to life in prison without eligibility for parole as required by N.J.S.A. 2C:11-3(b)(4). As part of his murder conviction, defendant was also sentenced to the prescriptions of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On his conviction for interfering with custody, defendant was sentenced to a consecutive five years in prison with two and a half years of parole ineligibility. The conviction for endangering the welfare of a child merged into the murder conviction.

Defendant appeals his convictions and sentence. We affirm.

I.

The facts were established at trial. Defendant had been in a dating relationship with I.B.[1] I.B. described the relationship as an on-again-off-again relationship that had lasted for over three years. Defendant and I.B. had been engaged, but I.B. had recently broken off the engagement. When the relationship was off, defendant obsessed about I.B. and would contact her excessively. For example, in the three days before the child's death, defendant called I.B. over 600 times.

Defendant and I.B. had a daughter, T.M.-G., who had been born in 2009. I.B. had primary custody of the daughter, and defendant had the right to parenting time. On November 21, 2011, defendant had parenting time with his two-year-old daughter beginning at approximately 2 p.m. He was supposed to return T.M.-G. at 6 p.m. The daughter, however, was never returned.

Through witness interviews, cell phone records, and store receipts, the police developed a timeline of defendant's activities on November 21, 2011. In the morning of that day, defendant had visited a friend, J.B., and they had smoked marijuana together. Between 11:30 a.m. and 1:20 p.m., defendant called a friend in California and the Greyhound Bus Company. At

---

[1] To protect privacy interests, witnesses and the victim will be identified by initials.

approximately 2 p.m., defendant picked up his daughter. As he was leaving with T.M.-G., defendant yelled obscenities at I.B. At approximately 4 p.m., defendant called J.B. and asked if he wanted to buy defendant's car for $300. Shortly thereafter, he visited McDonald's and then went to Shark River Park. Witnesses saw a car, matching the description of defendant's car, in the park between 4:30 p.m. and 6 p.m.

At approximately 6 p.m., defendant went to J.B.'s apartment without the child. The two men had a drink together and J.B. described defendant as acting normal. Defendant informed J.B. that he was going to California and asked J.B. to take him to the Asbury Park train station, which J.B. did at approximately 7 p.m.

Meanwhile, when T.M.-G. was not returned on time, I.B. called defendant to find out where he was. I.B. last spoke to defendant at approximately 6:30 p.m. on November 21, 2011. Defendant assured I.B. that T.M.-G. was okay, and he was getting gas and would be late. When defendant did not return with the child by 7 p.m., I.B. repeatedly called defendant, but he did not pick up any of her calls. At approximately 10 p.m., I.B. called the police.

Through surveillance videos, the police were able to track defendant's movements after he was dropped off at the Asbury Park train station. From Asbury Park, defendant traveled to the Long Branch train station and then to Penn Station in Newark. At Penn

Station, defendant boarded a Greyhound bus to Richmond, Virginia. Thereafter, defendant traveled from Virginia to California.

On November 29, 2011, United States Marshals arrested defendant in San Diego, California. Following his arrest, defendant was given his Miranda[2] warnings, he waived his rights, and gave a video-recorded statement. During that statement, defendant admitted that he had taken his daughter to Shark River Park on November 21, 2011. He also admitted that he had placed his daughter in a car seat, weighted down the car seat with a car jack, and placed the child in a stream. Defendant then left his daughter in the stream. Defendant claimed that the child was still alive and sitting up when he left.

Defendant stated that he had left his daughter in the stream because he could not bear the thought that he would not be able to see her due to conflicts with I.B. In that regard, he stated that thinking about what the child would go through "completely made [him] crazy." He also explained that he wanted to make the final decision for his daughter and he was at peace because his daughter was in Heaven.

The car seat with the lifeless child had been removed from a depth of approximately twenty inches of water. At that location,

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

the stream was approximately twenty-five feet wide and the seat was directly in the center of the stream. The seat had been on its right side with the child's left arm and leg facing skyward.

To try to determine how the car seat had come to that location, the prosecutor's office conducted three re-enactment scenarios. During the re-enactments, they used a car seat matching the one in which the child had been found. They then placed a sandbag weighing thirty-nine pounds in the seat, which was the weight of the child at the time of her death. Finally, they weighed the seat down with a car jack.

In the first scenario, an officer waded from the bank into the stream up to approximately eight inches of water and placed the car seat in the water. The car seat did not move. In the second scenario, the officer waded further into the stream to a higher elevation of water and dropped the car seat into the stream. The car seat rocked, but remained upright and thereafter did not move. In the third scenario, the police dropped the car seat from the center of the bridge, the seat landed on its back in the water and immediately sank without moving thereafter.

Following defendant's interview, on December 1, 2011, a San Diego sheriff's detective informed defendant that he was being extradited to New Jersey. Defendant responded, "I know that New

Jersey doesn't have a death penalty so what am I looking at when I get back there, what sentence?"

As part of their investigation, the police also identified a witness, C.T., with whom defendant had lived between July and October 2011. C.T. explained that she had allowed defendant to live rent free with her. She also stated that in July 2011, defendant had told her that "he would rather see his daughter dead than be with [I.B.]" C.T. also informed the police that she had lent defendant a car jack. At trial, defendant stipulated that the car jack lent by C.T. had been found attached to the child's car seat.

Prior to trial, defendant made a series of motions. He filed a motion for change of venue contending that there was presumptive prejudice against him because of media coverage of the child's death. The trial court denied that motion without prejudice to renewal during jury selection. Defendant also filed a motion to bar the prosecutor's re-enactment scenarios concerning how the car seat came to be located in the river. The trial court barred the State from introducing the videotape of the re-enactment scenarios, but allowed a detective to testify as to the various scenarios performed and their results.

Defendant also moved to suppress the statements he had given, including his statement to the San Diego sheriff's detective. After conducting a hearing, the trial court denied that motion.

At trial, the State introduced testimony from more than twenty witnesses. Among those witnesses, the jury heard from C.T. and the San Diego detective. The jury also heard redacted portions of defendant's recorded statement.

A medical examiner also testified concerning an autopsy conducted on T.M.-G. following her death. The medical examiner testified that the child had been healthy prior to her death and that there was no evidence of prior injury or abuse. The examiner opined that the child had died as a result of drowning and concluded that the child's death was a homicide.

After hearing the evidence, a jury convicted defendant of murder, endangering the welfare of a child, and interfering with the custody of a child. As already noted, defendant was then sentenced to life imprisonment without the possibility of parole. Defendant now appeals his convictions and sentence.

## II.

On appeal, defendant makes six arguments, which he articulates as follows:

> POINT I — BECAUSE THE TRIAL COURT'S CHARGE TO THE JURY WAS FLAWED THE CONVICTIONS MUST BE

REVERSED AND THE MATTER REMANDED FOR A NEW TRIAL

A. The trial court erred when it ignored the requirements of Delibero and refused to charge the jury with the Defense's proposed modified charge on "evidence of mental disease or defect["]

B. The trial court erred when it refused to charge the jury with passion/provocation manslaughter

C. The trial court failed to charge the jury on voluntary intoxication (not raised below)

POINT II — THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S REQUEST TO EXCUSE JUROR NUMBER [SIX] ONCE IT WAS DISCLOSED THAT JUROR NUMBER [SIX'S] DAUGHTER WAS FRIENDS WITH ONE OF THE WITNESSES

POINT III — THE TRIAL COURT ERRED WHEN IT ALLOWED [C.T.] TO TESTIFY REGARDING DEFENDANT'S STATEMENT THAT HIS DAUGHTER WOULD BE BETTER OFF DEAD

POINT IV — THE TRIAL COURT ERRED WHEN IT ADMITTED DEFENDANT'S STATEMENT TO [THE SHERIFF'S DETECTIVE] INTO EVIDENCE

POINT V — THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT A CHANGE OF VENUE

POINT VI — THE SENTENCE WAS EXCESSIVE

Having reviewed the record and law, we find no merit in any of defendant's arguments. We will address each argument in turn.

9                                                          A-1123-14T2

A.   The Jury Instructions

Defendant contends that the jury instructions were defective because they did not include (1) a modified diminished capacity instruction, (2) a passion/provocation manslaughter charge, and (3) an intoxicated defense charge.

Correct and appropriate jury charges are essential to a fair trial.  Reynolds v. Gonzalez, 172 N.J. 266, 288-89 (2002). Moreover, a trial judge has the duty to ensure that the jury receives accurate instructions on the law as it pertains to the facts and issues in each case, "irrespective of the particular language suggested by either party." State v. Baum, 224 N.J. 147, 159 (2016).

"Jury charges 'must outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them . . . .'" Reynolds, supra, 172 N.J. at 289 (quoting Velazquez v. Portadin, 163 N.J. 677, 688 (2000)).  Accordingly, "[an] alleged error is viewed in the totality of the entire charge, not in isolation." State v. Belliard, 415 N.J. Super. 51, 66 (App. Div. 2010) (quoting State v. Nero, 195 N.J. 397, 407 (2008)), certif. denied, 205 N.J. 81 (2011).

Generally, "an appellate court will not disturb a jury's verdict based on a trial court's instructional error 'where the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect.'" Wade v. Kessler Inst., 172 N.J. 327, 341 (2002) (quoting Fischer v. Canario, 143 N.J. 235, 254 (1996)). The focus is whether the instructions are capable of producing an unjust result or prejudicing substantial rights. Fisch v. Bellshot, 135 N.J. 374, 392 (1994).

Clearly erroneous instructions are "poor candidates for rehabilitation under the harmless error philosophy." State v. Loftin, 146 N.J. 295, 412 (1996) (quoting State v. Simon, 79 N.J. 191, 206 (1979)). Nevertheless, "[c]ourts uphold even erroneous jury instructions when those instructions are incapable of producing an unjust result or prejudicing substantial rights." Fisch, supra, 135 N.J. at 392.

1.   Diminished Capacity/State-of-Mind Instruction

Defense counsel asked the court to include a modified version of the "Evidence of Mental Disease or Defect" jury instruction. Although defense counsel acknowledged that he would not be presenting testimony regarding mental disease or defect, and that neither a diminished capacity nor an insanity defense applied in

11

this case, he nevertheless asked for a modified "state-of-mind" charge.

In making that argument, defense counsel cited and relied on the decision in State v. Delibero, 149 N.J. 90 (1997). The defendant in Delibero was charged with robbery and he introduced evidence of his diminished capacity and insanity. Id. at 94-95. That evidence included testimony from two psychiatric experts, both of whom testified that the defendant was suffering from a mental illness at the time of the offense. Ibid. There, the Court held that when a defendant presents evidence of insanity or diminished mental capacity, the jury should be instructed to consider such evidence in determining whether the State had proven beyond a reasonable doubt that defendant possessed the requisite mental state to be convicted of the offense charged. Id. at 106-07.

Here, the trial court rejected defendant's requested "state-of-mind" charge for three reasons. First, the court reasoned that given defendant's concession that he would not submit a mental defense to the jury, the charge would be confusing and misleading. Second, the court pointed out that the model charge on murder sufficiently and correctly addressed the state-of-mind and reasonable doubt issues. Finally, the court distinguished the facts in this case from the facts in Delibero. Id. at 93-95. The

A-1123-14T2

trial court then gave instructions that tracked the model charges for murder, including an instruction on the requisite state of mind and that the State had the burden to prove the requisite purpose or knowledge beyond a reasonable doubt.

We discern no error in the trial court's jury instruction as it related to state of mind. Here, there was no evidence that defendant suffered from a mental disease or defect affecting his ability to act with the requisite purpose or knowledge. Defendant offered no expert to support such a position. Instead, defendant contends that evidence related to his mental defects included (1) statements he made to the police during his interview, (2) references that he suffered from sleep deprivation, (3) his obsessive phone calls, and (4) a reference to an attempted suicide in June 2011.

As the trial court correctly found, none of that evidence rose to the level of establishing insanity or a diminished capacity. See Id. at 92 ("Diminished capacity describes a disease or defect of mind that may negate the mental state that is an element of the offense charged."). Indeed, as already pointed out, defense counsel did not request a diminished capacity instruction. Instead, he requested a sui generis "state-of-mind" instruction that he crafted. We agree with the trial court that

giving such an instruction in the context of this case would have been potentially confusing and misleading.

Finally, we note, that defense counsel was permitted to make arguments about defendant's state of mind as it related to the charges against him. Thus, there is also no showing of an unjust result or prejudice to any of defendant's rights.

2. Passion/Provocation

Defendant also argues that the trial court erred in not instructing the jury on the passion/provocation defense to murder. We disagree.

Passion/provocation manslaughter is a murder committed in the heat of passion in response to provocation. N.J.S.A. 2C:11-4(b)(2). Passion/provocation has four elements: "(1) reasonable and adequate provocation; (2) no cooling off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; [and] (4) a defendant who did not cool off before the slaying." State v. Galicia, 210 N.J. 364, 379-80 (2012) (quoting State v. Josephs, 174 N.J. 44, 103 (2002)). The first two elements are "objective[,]" and if those elements are supported by the evidence, passion/provocation manslaughter should be charged and the remaining two subjective elements should be left to the jury to consider. Josephs, supra, 174 N.J. at 103.

Here, defendant argues that he killed his two-year-old daughter in the heat of passion resulting from reasonable provocation by the child's mother. The trial court denied defendant's request for such an instruction, holding that provocation will not mitigate the murder of an innocent bystander. The trial court also reasoned that the words of the mother, spoken over the phone to defendant, were not sufficient to constitute adequate provocation. Finally, the trial court found that there was no rational basis for a jury to determine that defendant's response of murdering the child was proportionate to any words allegedly spoken by the mother.

We agree with the trial court on all three grounds. We have previously held that "the killing of innocent bystanders does not qualify as a homicide incited by provocation." State v. Lewis, 223 N.J. Super. 145, 151 (App. Div.), certif. denied, 111 N.J. 584 (1988). That holding in Lewis applied and controlled here. Defendant's argument that the Supreme Court may someday disagree with our holding in Lewis is not persuasive. Indeed, the facts here only underscore that passion/provocation does not apply to the killing of an innocent child.

Moreover, the facts presented in this trial did not constitute adequate provocation. Furthermore, there was no evidence indicating that defendant had an inadequate cooling off period

15                                                      A-1123-14T2

between the alleged provocation and slaying. Defendant had his daughter in his care for several hours before he put her in the stream. During that time, he made phone calls to a friend, as well as to the child's mother. The record here is simply devoid of any evidence of either a proportional provocation or an inadequate time to cool off.

3. Voluntary Intoxication

Defendant never requested an intoxication instruction at trial. Now, however, he contends that because there was some evidence that he had smoked marijuana and purchased liquor, the trial judge should have sua sponte instructed the jury on voluntary intoxication. We discern no plain error and, thus, we conclude that there was no error capable of producing an unjust result.

Here, while there was some evidence that defendant smoked marijuana earlier in the day, there was no evidence that he was under the influence when he killed his child. Consequently, because the evidence did not "'clearly indicate' the appropriateness of [an intoxication] charge[,]" the trial judge did not err by not giving such a charge. State v. R.T., 411 N.J. Super. 35, 48 (App. Div. 2009) (quoting State v. Savage, 172 N.J. 374, 397 (2002)), certif. denied, 205 N.J. 493 (2011).

B.     The Trial Court's Refusal to Excuse Juror Number Six

At the beginning of the fourth day of testimony, juror number six informed the trial judge that he had learned that a State's witness who testified the day before was a classmate of his daughter. The trial court appropriately questioned the juror in the presence of counsel. The juror explained that he had just learned that the witness had gone to school with his daughter and his daughter had informed him of that fact the night before. The juror also disclosed that when the witness actually testified, he did not recognize him, but he acknowledged that the witness had visited his house in the past. The juror then informed the court that the connection of the witness to his daughter would in no way affect his ability to be fair and impartial.

Following this questioning, defense counsel requested the judge to excuse juror number six. Counsel could only explain that defendant was not "comfortable now with this juror." The trial court properly found that there was no cause to dismiss juror number six. The trial court also noted that the witness' testimony was similar to another witness' testimony and really did not address a disputed issue.

Defendant now argues that had he known this information during jury selection, he would have exercised a peremptory challenge. Thus, his rights were adversely affected when the trial court

refused to excuse juror number six. We disagree. Once trial begins, jurors may be dismissed only for "good cause." R. 1:8-2(d)(1). If a jury discloses information after he or she has been sworn which, if revealed during selection, would have drawn a peremptory challenge, there may be grounds for objection. See State v. Jackson, 43 N.J. 148, 162 (1964).

Here, in contrast, juror number six did not fail to disclose known information during the selection process. Instead, juror number six only became aware that one of the witnesses was a classmate of his daughter the night after the witness testified. Thus, the juror did not give incorrect or misleading information, nor did he fail to disclose information during jury selection.

Moreover, there is no showing of any prejudice to defendant. Under questioning by the trial judge, the juror assured the court and counsel that the connection between his daughter and the witness would have no influence on his ability to be fair and impartial. There is nothing in the record to question that assurance.

C. Defendant's Statements to C.T.

Defendant challenges the trial court's admission of C.T.'s testimony that defendant told her that "he would rather see his daughter dead than be with her mother." Defendant contends that the prejudicial effect of that testimony outweighed its probative

value and the testimony should have been excluded under N.J.R.E. 403. Defendant also contends that the trial court's instruction to the jury concerning C.T.'s testimony was defective because it failed to mold the instruction to the facts.

We review a trial court's evidentiary rulings for abuse of discretion. State v. Nantambu, 221 N.J. 390, 402 (2015). Accordingly, a trial court's evidentiary rulings will not be overturned unless a manifest injustice has occurred. State v. J.D., 211 N.J. 344, 354 (2012). "To the extent [a] defendant's argument . . . raises a question of law, . . . our review is de novo and plenary." Ibid.

N.J.R.E. 403 provides that "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury." "The mere possibility that evidence could be prejudicial does not justify its exclusion" under N.J.R.E. 403. State v. Brockington, 439 N.J. Super. 311, 333 (App. Div. 2015) (quoting State v. Long, 173 N.J. 138, 164 (2002)). Instead, for evidence to be excluded under N.J.R.E. 403, the probative value must be "so significantly outweighed by its inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues in the case." State

v. Wakefield, 190 N.J. 397, 429 (2007) (quoting State v. Koskovich, 168 N.J. 448, 486 (2001)).

Here, the trial court conducted a Rule 104 hearing before allowing C.T. to testify. The judge found that the statement was a statement by a party opponent and was admissible hearsay under N.J.R.E. 803(b). The judge also found that the statement had probative value to the disputed issue concerning defendant's purpose and motive for killing his daughter. Finally, the judge found that probative value was not substantially outweighed by any potential prejudice.

We discern no abuse of discretion in the trial court's ruling allowing C.T. to testify. Defendant's statements to C.T. went directly to the disputed issue of defendant's motive and planning of the murder. That the statement was made four months prior to the murder was a fact that the jury could consider in weighing the value of the testimony, but it does not support the exclusion of the testimony.

After C.T. testified, the court instructed the jury on the appropriate use of defendant's statement. In that regard, the court's instructions followed the model charge concerning statements of defendant. Defendant now argues that the charge was imbalanced because it focused the jury on defendant's intent

without instructions about considering evidence that negated defendant's intent.

We discern no error in the trial court's instructions in this case. Moreover, defense counsel did not object to the instructions when they were given and we discern no plain error in the instructions. State v. Funderburg, 225 N.J. 66, 79 (2016).

D. Defendant's Statement to the San Diego Detective

Next, defendant contends that the trial court erred in allowing the San Diego detective to testify concerning the statement defendant made to the detective. During his extradition, defendant asked the San Diego detective: "I know that New Jersey doesn't have a death penalty, so what am I looking at when I get back there, what sentence?" Before trial, the court conducted a hearing and found that the statement was admissible and denied defendant's motion to suppress. Defendant did not challenge the statement under N.J.R.E. 403 at the trial, but he now argues that the statement's probative value is substantially outweighed by its prejudicial effect and, therefore, it should have been precluded under N.J.R.E. 403.

Defendant's statement to the detective about his potential sentence had probative value in that it tended to show he knew what he had done and that what he had done was wrong. We discern no error in the trial court's admission of that statement.

21

Moreover, we discern no plain error because the admission of that statement was not "clearly capable of producing an unjust result." R. 2:10-2; State v. Green, 447 N.J. Super. 317, 325 (App. Div. 2016).

E. The Motion for Change of Venue

Defendant also contends that the trial court erred when it denied his motion to change venue. Before trial, defendant filed a motion to change venue based on the presumptive prejudice against him because of media coverage of the child's death. The trial court denied the motion without prejudice, permitting defendant to renew the motion during jury selection. Defendant, however, never renewed his motion to change venue.

We review a trial court's decision on a motion to change venue under an abuse of discretion standard. State v. Nelson, 173 N.J. 417, 476-77 (2002). The trial court has discretion in determining whether a change of venue is "necessary to overcome the realistic likelihood of prejudice from pretrial publicity." State v. Biegenwald, 106 N.J. 13, 33 (1987) (quoting State v. Williams, 93 N.J. 39, 67-68 n. 13) (1983)). Here, we discern no abuse of discretion. The trial court afforded defendant an opportunity to renew the motion during jury selection. Defendant never took that opportunity.

Further, there is no evidence in the record that suggests the jury selection process was tainted by media publicity. Each potential juror was asked whether he or she had any knowledge of the case prior to the trial. Some answered "yes," but explained that their recollection of the event was vague and limited. The trial court also asked each prospective juror whether he or she could decide the case based solely on what will be presented during trial. Each selected juror answered affirmatively.

F. The Sentence

Finally, defendant argues that the trial judge erred in imposing consecutive sentences for his convictions of murder and interfering with the custody of a child. In that regard, defendant contends that the sentencing judge failed to conduct an adequate analysis of the Yarbough factors. State v. Yarbough, 100 N.J. 627 (1985), cert. denied, 475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986). We reject this contention.

Appellate review of sentencing decisions is deferential and governed by an abuse of discretion standard. State v. Blackmon, 202 N.J. 283, 297 (2010). "The reviewing court must not substitute its judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). An appellate court must affirm a sentence unless:

23                                                          A-1123-14T2

> (1) the sentencing guidelines were violated;
> (2) the aggravating and mitigating factors
> found by the sentencing court were not based
> upon competent and credible evidence in the
> record; or (3) "the application of the
> guidelines to the facts of [the] case makes
> the sentence clearly unreasonable so as to
> shock the judicial conscience."
>
> [Fuentes, supra, 217 N.J. at 70 (alteration
> in original) (quoting State v. Roth, 95 N.J.
> 334, 364-65 (1984)).]

Whether a sentence violates sentencing guidelines is a question of law that we review de novo. State v. Robinson, 217 N.J. 594, 603-04 (2014).

In Yarbough, the Court set forth the factors to be considered when deciding whether to impose consecutive or concurrent sentences. Yarbough, supra, 100 N.J. at 643-44. The Yarbough factors essentially focus upon "the nature and number of offenses for which the defendant is being sentenced, whether the offenses occurred at different times or places, and whether they involve numerous or separate victims." State v. Carey, 168 N.J. 413, 423 (1989). The "no free crimes" guideline set forth in Yarbough "tilts in the direction of consecutive sentences because the Code focuses on the crime, not the criminal." Ibid.

Considering these criteria, the trial court properly imposed consecutive sentences because the court found that the interference with custody conviction was a separate crime from the

murder conviction. We discern no abuse of discretion in the imposition of a consecutive sentence in this matter.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1123-14T2