# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3225-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

G.S.,

     Defendant-Appellant.

_____

Argued February 27, 2024 – Decided March 22, 2024

Before Judges Whipple, Mayer and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 20-02-0149.

Zachary Gilbert Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Zachary Gilbert Markarian, of counsel and on the brief).

Leandra L. Cilindrello, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Leandra L. Cilindrello, of counsel and on the brief).

PER CURIAM

Defendant G.S. appeals from a judgment of conviction and sentence after a jury found him guilty of sexually assaulting a minor under the age of thirteen and related offenses. We affirm as to the conviction and sentence. However, we remand to the sentencing court to provide reasons in support of the penalty imposed under the Sex Crime Victim Treatment Fund (SCVTF), N.J.S.A. 2C:14-10(a).

We recite the facts from the fresh complaint evidentiary hearing and the trial testimony.

G.V. (Gia)[1] is the mother of five children, including the victim in this case, W.C. (Wanda), born in 2004. Defendant lived with Gia and her children from 2011 until his arrest.[2]

Wanda alleged defendant sexually assaulted her on three occasions. According to Wanda, the first assault occurred when she was eleven years old. The second assault occurred just after her thirteenth birthday. The third assault took place when she was fourteen after the family returned from a trip to a lake.

---

[1] We use pseudonyms to preserve the parties' confidentiality. R. 1:38-3(c)(9) and N.J.S.A. 2A:82-46.

[2] Defendant and Gia were never married.

A-3225-21

At trial, Wanda described the three sexual assaults in detail. She explained each assault occurred in her bedroom. At the time of the sexual assaults, Wanda shared a bedroom with her two brothers. However, the brothers were heavy sleepers and heard nothing during any of the alleged assaults.

On February 25, 2020, a grand jury indicted defendant on the following charges: first-degree aggravated assault, N.J.S.A. 2C:14-2(a)(1); second-degree sexual assault, N.J.S.A. 2C:14-2(b); three counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1); two counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(c); and two counts of first-degree sexual assault, N.J.S.A. 2C:14-2(c)(4). Defendant pleaded not guilty to these charges.

Prior to trial, the State moved to admit fresh complaint testimony from Gia and Wanda's school friend, A.C. (Amy). Defendant served a subpoena on Wanda, seeking to have her testify at the fresh complaint hearing.

The motion judge conducted a two-day evidentiary hearing on the fresh complaint evidence. The judge denied defendant's request to have Wanda testify at this hearing.

At the conclusion of the fresh complaint hearing, the judge found Wanda made complaints to Gia regarding defendant's sexual abuse. Specifically,

3

Wanda "told her mother via text message[s] and [a] phone call that the defendant 'violated her.'" The judge further found Gia "is a person [Wanda] would normally turn to for support" and the "disclosure was made within a reasonable time of the abuse." The judge noted that the last incident of sexual abuse occurred on August 25, 2018, and Wanda disclosed the abuse to her mother on August 27, 2018. The judge determined "the disclosure was spontaneous and voluntary."

During the hearing, Gia also testified about her family's trip to a lake on August 25, 2018. Gia and her family were joined by additional family and friends, including Wanda's teenage boyfriend. According to Gia, Wanda's aunt saw Wanda "kissing and hugging" the boyfriend. When Gia later learned this information, she sent a text to Wanda about Wanda's relationship with the boyfriend.

Gia and Wanda then exchanged a series of text messages. In the text messages, Wanda sought to avoid a discussion about her relationship with the boyfriend. Wanda texted that she had to talk to her mother "about something." Gia pursued the text message exchange, asking what it was that Wanda wanted to discuss. In response, Wanda again deflected. Gia then asked via text message

if someone "disrespected" Wanda. Wanda eventually texted Gia that, two nights earlier, defendant entered her bedroom and "raped [her]".

Amy also testified at the fresh complaint hearing. Amy and Wanda attended seventh grade together and were best friends at the time. According to Amy, Wanda twice shared that defendant "had touched her inappropriately." The judge found Amy's testimony "credible," "reasonable," and "believable." The judge also determined Amy was "a person that [Wanda] would normally turn to," the timeliness of Wanda's revelations "occurred while the abuse was ongoing," and Wanda's disclosures to Amy were "voluntary and spontaneous."

At the conclusion of the fresh complaint hearing, the judge granted the State's motion to introduce fresh complaint testimony from Gia and Amy during the trial. The judge expressly allowed the testimony "conditioned upon 1) the victim testifying at trial and 2) subject to the limiting instruction, instructing the jurors how to consider fresh complaint testimony."

Defendant's trial took place over four non-consecutive days in November 2021. During opening argument, defense counsel stated:

> Now, the State is likely going to try to argue that [Wanda]'s story alone is enough to convict [defendant]. . . . [T]he State might argue, why would [Wanda] make it up if it wasn't true?

. . . You're . . . going to hear that on the day that [Wanda] told her mom that [defendant] was abusing her, it was directly in response to her mother confronting [Wanda] about kissing [Wanda]'s boyfriend.

The trial judge interrupted defense counsel's opening statement and asked counsel to convene at sidebar. At the sidebar conference, the judge sua sponte raised an objection to defense counsel's reference to Wanda kissing the boyfriend. The judge concluded kissing was "sexual conduct" and any reference to kissing was barred under the Rape Shield Law, N.J.S.A. 2C:14-7.

In addition to concluding the Rape Shield Law barred the kissing reference, the judge also excluded the reference under N.J.R.E. 403. The judge ruled:

> I think that the prejudice here, even making [the] argument that it has that evidential exception, the prejudice here outweighs any probative value the evidence might have. So, the point is that I think that probative value here is really low in comparison. Even if you judge it ultimately by let's say just regular rules of evidence let's assume for the sake of argument it[']s not ultimately inherently sexual in nature . . . . The allegation is that she is kissing this boyfriend. . . . I don't know that this assertion is relevant to the crimes allegedly committed here. It renders the probative value low . . . . [A]ny probative value [is] substantially outweighed by the great risk of undue prejudice on this child. So that would be pursuant to Rule 403.

The judge also gave the following curative instruction to the jury regarding the kissing reference during opening argument:

> So, ladies and gentlemen[,] if you see the [c]ourt stop counsel at all throughout the trial, ask them to approach the bench in the midst of any portion of the trial[,] I just want to advise you it's merely to deal with legal issues that from time to time arise and evolve and that we're trying to decide. You shouldn't have any negative speculation or inferences that you should draw from those occurrences. They're common during any trial. Now, in addition, you heard a statement during opening arguments that the circumstances of the child's disclosure of sexual abuse by defendant came about while the child was being questioned by her mother, if she, the child had kissed her boyfriend. As I told you earlier today, statements made by counsel in opening and closing arguments are not evidence and should not be regarded as evidence by you. Additionally, I'm striking that portion of the opening statement. That means that the statement must be disregarded by you and it shall not enter into your final deliberations. This means that even though you may remember the testimony, you are not to use it in your discussions or deliberations.

As part of defendant's trial strategy, defense counsel asserted Wanda lied about defendant's sexual abuse to deflect from Gia's concerns that Wanda engaged in some form of inappropriate conduct. As part of her ultimate ruling on the exclusion of any reference to Wanda's kissing her teenage boyfriend, the judge explained there were other ways for defense counsel to achieve the same objective during the trial. The judge stated:

7

defendant still has the complete opportunity based on the arguments made before the jury to set forth their reasonable defense that [Wanda] didn't like [defendant], they didn't get along, they had a bad relationship, he bad mouthed her . . . . He would belittle her. So, the defense even without this still has the opportunity to argue . . . that [Wanda] made it up, that [the sexual assaults] didn't happen, because of their bad relationship, because he would belittle her and verbally abuse her. All of those defenses are still open, available, and viable to the defense.

Thereafter, defendant's trial continued. Defense counsel never mentioned Wanda kissing her boyfriend again.

During the trial, the jury heard testimony from the State's witness, Detective Kilbret Boreland, who investigated Wanda's sexual assault allegations. The detective explained she used buccal swabs to obtain a DNA sample from Wanda. She also testified she collected buccal swab samples from defendant. On this issue, the following exchange occurred between the detective and the prosecutor:

> Q. . . . Did there come a point in time where you collected buccal swabs from [] defendant?
>
> A. Yes, pursuant to a court order.
>
> Q. Okay. So, he did not provide them voluntarily?
>
> A. No.

Detective Boreland also testified that defendant's DNA was not found on or inside Wanda's body, or on any items taken as evidence from Wanda's bedroom. The detective further explained none of Wanda's family or friends reported witnessing defendant sexually abuse Wanda, and the nurse who examined Wanda found no physical injuries.

Amy testified at trial consistent with her testimony during the fresh complaint evidentiary hearing.

Prior to Gia's trial testimony, outside the jury's presence, the judge and counsel discussed the permissible scope of defense counsel's cross-examination of Gia. The following exchange took place:

> JUDGE: As far as I'm concerned, I think reasonably speaking you can ask [Gia] did this begin as a result of you confronting your daughter about something you thought she did.
>
> DEFENSE COUNSEL: That's all that I want to ask.
>
> JUDGE: I think that's perfectly permissible. It answers the question or brings in the issue that you want to bring in, which is she thought she was in trouble, right? You can make that argument to the [j]ury. She thought she was in trouble and as a result of that she made this whole thing up. Right?
>
> DEFENSE COUNSEL: Yeah, I think [] that question is fine, Judge.
>
> JUDGE: Fair enough?

9

DEFENSE COUNSEL:  Yes.

JUDGE:  Do you have any issue with that question?

PROSECUTOR:  No, because I do think the [d]efense has, you know, should have the ability to present what they think is [the motivation] [to] lie.  I think it covers that.

Gia then testified at trial.  Gia stated she was a "[h]eavy sleeper" and never witnessed defendant sexually assault Wanda.  Gia also heard no noises emanating from Wanda's bedroom on the dates of the alleged sexual assaults. Gia further testified Wanda never complained of any injury that might have been linked to the sexual abuse.  Gia confirmed she first learned defendant sexually assaulted Wanda after her text exchanges with Wanda on August 27, 2018.  Gia also testified defendant tended to scold, yell, and verbally abuse Wanda.  As a result, Gia explained Wanda disliked defendant.

Wanda testified at trial regarding the three sexual assaults.  She also explained she told Amy about defendant's sexual abuse to "see how [Amy would] react" to gauge how Gia might react to such a disclosure.  Wanda testified she initially did not report defendant's abuse because she feared losing defendant's financial support for her family and damaging defendant's relationship with one of her brothers.  However, Wanda stated she was "already

planning to tell" Gia about defendant's abuse before August 27, 2018, because Wanda "wanted it to stop."

The State also called forensic nurse examiner, Joanne Hatt, to testify at trial. Nurse Hatt conducted a forensic medical examination on Wanda and took DNA samples from her on August 27, 2018. Based on her examination, Nurse Hatt found Wanda's genitals were "normal," and discovered no bruises, cuts, tears, scratches, or abrasions anywhere on Wanda's body. Nurse Hatt confirmed she found no "physical signs or injuries" to indicate Wanda had been sexually assaulted.

As part of the trial testimony, counsel stipulated the evidence from Wanda's sexual assault kit and the items taken from Wanda's bedroom did not reveal the presence of any seminal fluids. Counsel also stipulated the results of Wanda's buccal swabs found no male DNA.

During closing argument, defense counsel argued Wanda's story was fabricated because her allegations were unsupported by any physical evidence or eyewitness testimony. Defense counsel noted Detective Boreland found no evidence supporting Wanda's allegations and Nurse Hatt found no physical signs of abuse. Defense counsel also highlighted various inconsistencies in Wanda's testimony.

11

Defense counsel also argued Wanda's story "ma[de] no sense," citing Wanda's testimony that defendant assaulted her at least once when her brother was sleeping in the same bed. Defense counsel questioned whether Wanda's brother could have slept through defendant's assaulting Wanda without waking.

Defense counsel further argued Wanda's troubled relationship with defendant provided sufficient motive for Wanda to "want [defendant] out of the house." Defense counsel emphasized Wanda's text message confrontation with Gia provided motive for Wanda to "make this story up," "distract [Gia] from whatever [Gia] was confronting her about," and "avoid getting in trouble."

On November 9, 2021, a jury found defendant guilty on all counts. The judge conducted a sentencing hearing on May 13, 2022. In weighing the aggravating and mitigating factors, the judge applied aggravating factors one, two, three, and nine, N.J.S.A. 2C:44-1(a)(1), (2), (3), and (9), and mitigating factors six, seven, and fourteen N.J.S.A. 2C:44-1(b) (6), (7), and (14). The judge determined the aggravating factors outweighed the mitigating factors.

Upon merging certain counts, the judge sentenced defendant as follows: twenty-five years in prison with no parole eligibility, registration pursuant to Megan's Law, and parole supervision for life on count one; seven years in prison, registration pursuant to Megan's Law, and parole supervision for life on count

12

three; twelve years in prison subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and five years of parole supervision upon release on count four; and twelve years in prison subject to NERA and five years of parole supervision upon release on count seven. The judge ordered the sentences on counts three and seven to run concurrent to the sentence on count one and the sentence on count four to run consecutive to count one. In the aggregate, defendant received a total of thirty-seven years in prison. The judge also ordered restitution in the amount of $20,630.66 and assessed a penalty of $7,000 payable to the SCVTF.

On appeal, defendant raises the following arguments:

POINT I

> THE TRIAL COURT DEPRIVED G.S. OF THE RIGHT TO PRESENT A COMPLETE DEFENSE AND THE RIGHT TO CONFRONT THE WITNESSES AGAINST HIM BY PROHIBITING CRITICAL TESTIMONY REGARDING THE COMPLAINING WITNESS'S MOTIVE TO FABRICATE.
>
> A. Testimony That [Wanda] First Accused G.S. of Rape in Response to Being Questioned By Her Mother About Kissing Her Boyfriend Was Not Subject to the Rape Shield Statute Because Kissing Is Not "Sexual Conduct."
>
> B. Even If the Evidence Fell Under the Rape Shield Statute, It Could Not Constitutionally Be Excluded As

13

It Was Highly Relevant and Far More Probative than Prejudicial.

POINT II

THE STATE IMPROPERLY BOLSTERED THE CREDIBILITY OF [WANDA], ITS CENTRAL WITNESS, BY ELICITING TESTIMONY FROM HER MOTHER ABOUT THE ULTIMATE ISSUE AND [WANDA]'S CREDIBILITY AND ARGUING IN SUMMATION THAT THE JURY SHOULD BELIEVE [WANDA] BECAUSE AN INVESTIGATOR HAD "LOOK[ED] INTO" HER CLAIMS.  (Not raised below).

POINT III:

THE PROSECUTOR IMPROPERLY ELICITED TESTIMONY COMMENTING ON G.S.'S EXERCISE OF HIS FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES.  (Not raised below).

POINT IV

THE TRIAL COURT VIOLATED G.S.'S DUE PROCESS RIGHTS BY ADMITTING EVIDENCE OF [WANDA]'S ALLEGED PRIOR DISCLOSURES AS FRESH COMPLAINT EVIDENCE WITHOUT PERMITTING G.S. TO QUESTION [WANDA] REGARDING THOSE DISCLOSURES.

POINT V

THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DENIED G.S. A FAIR TRIAL.  (Not raised below).

POINT VI

A REMAND FOR RESENTENCING IS REQUIRED BECAUSE THE COURT ERRED IN FINDING AND WEIGHING AGGRAVATING FACTORS AND FAILED TO EXERCISE ITS REQUISITE DISCRETION IN SETTING A TOTAL FINANCIAL OBLIGATION OF $31,260.66. (Not raised below).

A. The Court Improperly Double-Counted the Elements of the Offense in Finding Aggravating Factor Nine and Refusing to Find Mitigating Factor Nine, Resulting in An Excessive Sentence.

B. A Remand is Necessary Because the Sentencing Court Failed to Consider G.S.'s Ability to Pay the Substantial $20,630.66 Amount of Restitution Imposed by the Victims of Crime Compensation Board.

C. The Sentencing Court Failed to State Its Reasons for the Discretionary Amount of the SCVTF Penalties It Set, Instead Mistakenly Believing It Was Required to Impose a Maximum Penalty on Each Conviction.

I.

We first consider defendant's argument that the judge erred by excluding testimony regarding Wanda's kissing her teenage boyfriend at the lake. We reject this argument.

We review a trial judge's decision to admit or exclude evidence for "palpable abuse of discretion." State v. R.Y., 242 N.J. 48, 64-65 (2020). A trial court abuses its discretion "when relevant evidence offered by the defense and

15

necessary for a fair trial is kept from the jury." Id. at 65 (quoting State v. Cope, 224 N.J. 530, 554-55 (2016)). An abuse of discretion "arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Ibid. (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

Where a trial judge "weighs the probative value of evidence against its prejudicial effect pursuant to N.J.R.E. 403, [the judge's] ruling should be overturned only if it constitutes 'a clear error of judgment,'" State v. Cole, 229 N.J. 430, 449 (2017) (quoting State v. Koedatich, 112 N.J. 225, 313 (1988)), such that "its finding was so wide of the mark that a manifest denial of justice resulted," ibid. (quoting State v. Carter, 91 N.J. 86, 106 (1982)).

However, "if a trial court's discretionary decision is based upon a misconception of the law," our review is de novo. State v. Lyons, 417 N.J. Super. 251, 258 (App. Div. 2010) (citing Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995)). We also review questions of statutory interpretation de novo. State v. Fuqua, 234 N.J. 583, 591 (2018).

Here, the judge proffered two reasons for excluding testimony regarding Wanda kissing her boyfriend. The judge excluded the testimony under the Rape

Shield Law, N.J.S.A. 2C:14-7. Additionally, applying the analysis under N.J.R.E. 403, the judge concluded the probative value of such testimony was outweighed by its prejudice.

The judge likely erred in excluding the referenced testimony under the Rape Shield Law. However, the judge properly excluded the reference to Wanda's kissing her boyfriend under N.J.R.E. 403.

New Jersey's Rape Shield Law provides:

> a. In prosecutions for aggravated sexual assault, sexual assault, . . . [or] endangering the welfare of a child in violation of [N.J.S.A.] 2C:24-4 . . . , evidence of the victim's previous sexual conduct shall not be admitted . . . [,] except . . . [i]f the court finds that evidence offered by the defendant regarding the sexual conduct of the victim is relevant and highly material . . . , and that the probative value of the evidence offered substantially outweighs its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim, the court shall enter an order setting forth with specificity what evidence may be introduced and the nature of the questions which shall be permitted . . . .
>
> . . . .
>
> c. Evidence of previous sexual conduct with persons other than the defendant . . . shall not be considered relevant unless it is material to proving the source of semen, pregnancy or disease.
>
> . . . .

17

f. For the purposes of this section, "sexual conduct" shall mean any conduct or behavior relating to sexual activities of the victim, including but not limited to previous or subsequent experience of sexual penetration or sexual contact, use of contraceptives, sexual activities reflected in gynecological records, living arrangement and life style.

[N.J.S.A. 2C:14-7.]

The Rape Shield Law governs the admissibility of "evidence of the victim's previous sexual conduct" in prosecutions for sexual assault cases. N.J.S.A. 2C:14-7(a).  "[S]exual conduct" is defined as "any conduct or behavior relating to sexual activities of the victim, including but not limited to previous or subsequent experience of sexual penetration or sexual contact. . . ."  N.J.S.A. 2C:14-7(f).

"The statute's purpose "'is to protect the privacy interests of the victim while ensuring a fair determination of the issues bearing on the guilt or innocence of the defendant."'"  State v. J.D., 211 N.J. 344, 355 (2012) (quoting State v. P.S., 202 N.J. 232, 261 (2010)).  The statute is meant to "deter the unwarranted and unscrupulous foraging for character-assassination information about the victim" and "does not permit introduction of evidence of the victim's past sexual conduct to cast the victim as promiscuous or of low moral character."

Ibid. (quoting State v. Schnabel, 196 N.J. 116, 128 (2008)). "Those concerns apply equally to a child-victim." Schnabel, 196 N.J. at 128.

However, the protection of a child-victim must be balanced against a defendant's right to have "a meaningful opportunity to present a complete defense." State v. Budis, 125 N.J. 519, 531 (1991) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). In applying this balancing approach, our Supreme Court has construed the statute to disallow "evidence of prior sexual conduct that is only material (not highly material) and that only has probative value outweighing (not substantially outweighing) its prejudicial impact." State v. Garron, 177 N.J. 147, 172 (2003).

"The determination of whether evidence of a victim's prior sexual conduct is admissible 'is exquisitely fact-sensitive' and 'depends on the facts of each case.'" State v. Perry, 225 N.J. 222, 238 (2016) (quoting J.D., 211 N.J. at 358). The trial court must "weigh the relevance of the proffered evidence, its necessity to the defense, and its apparent veracity against its potential to humiliate the victim, invade her privacy, and confuse the jury." J.D., 211 N.J. 358.

Here, the judge concluded kissing was "sexual conduct" and, therefore, defendant was obligated to file a motion under the Rape Shield Law prior to introducing such evidence. We disagree kissing is "sexual conduct" under the

19

statute. Simply kissing, absent additional context or further details, is not defined as sexual conduct under our Rape Shield Law.

The State's argument that kissing, without contextual background information, constitutes sexual contact, or even sexual activity, would extend the Rape Shield Law beyond its stated intent and purpose. For example, if the State's position was correct, the Rape Shield Law could arguably be applied to a grandparent kissing a grandchild. Such a position is belied by the text of the Rape Shield Law. Therefore, we are satisfied that the judge erred in applying the Rape Shield Law to preclude testimony about Wanda kissing her teenage boyfriend.

However, the judge's exclusion of the kissing reference under the Rape Shield Law does not end our analysis. The judge also determined the probative value of the reference was outweighed by its prejudice to Wanda under N.J.R.E. 403.

N.J.R.E. 403 provides "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of . . . [u]ndue prejudice." Evidence claimed to be unduly prejudicial is excluded only where its "'probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair

evaluation' of the issues in the case." State v. Koskovich, 168 N.J. 448, 486 (2001) (alteration in original) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)).

Here, the judge found the kissing testimony "[ir]relevant to the crimes allegedly committed" by defendant, "render[ing] the probative value low." The judge further found the testimony threatened to "imply some form [of] promiscuity on the part of [Wanda] and to smear her character."

Defendant's trial strategy involved proffering evidence that Gia sought to confront Wanda because Gia disapproved of Wanda's conduct with her boyfriend. Defense counsel intended to argue to the jury that rather than engage in confrontation with her mother on that subject, Wanda redirected her mother's inquiry by disclosing defendant's sexual abuse. Despite defendant's arguments to the contrary, defense counsel proffered evidence in support of his legal strategy.

Specifically, the judge permitted defense counsel to extensively cross-examine Gia related to her text messages with Wanda that led to the disclosure of defendant's sexual abuse. The judge merely precluded defense counsel from questioning Gia about Wanda kissing her boyfriend at the lake. In that regard, defendant's attorney engaged in the following examination of Gia:

Q. . . . [Y]ou had a text message conversation with [Wanda]. Correct?

A. Yes.

Q. At some point in that conversation, [Wanda] made a disclosure to you.

A. Yes.

Q. That disclosure did not come in the first text message, did it?

A. No.

Q. You sent the first text message in that conversation.

A. Yes.

Q. So you started the conversation with [Wanda].

A. Yes.

Q. And you texted [Wanda] because you had heard something about her.

A. Yes.

Q. And so you texted her to confront her about what you had heard.

A. Yes.

Q. And rather than responding to what you had confronted [Wanda] about, she told you that she needed to talk to you about something.

22

A-3225-21

A.    Yes.

Based on the foregoing testimony, the jury could have presumed Gia learned Wanda skipped school, drank alcohol, took drugs, or engaged in some other misconduct that might lead a mother to confront a daughter.  Thus, the jury may have believed the misconduct Gia sought to address with her daughter was far worse than two teenagers kissing.

Here, the actual misconduct was not as important as defense counsel's effort to demonstrate Wanda had a motive to lie to her mother.  In support of that theory, defense counsel made the following arguments during his closing statement:

> [L]et's think about the circumstances of [Wanda]'s disclosure to her mom.  [Gia] said on the stand that . . . [Wanda] disclosed to her via text message that [defendant] raped her.  On cross, . . . [Gia] clarified… that [Wanda]'s accusation wasn't just out of the blue.  [Gia] initiated that text conversation.  And she started it by confronting [Wanda] about something [Gia] had heard that [Wanda] had done.
>
> And rather than respond to that text, rather than respond to her mom's accusation, [Wanda] deflected and distracted.  She changed the subject. . . .  And it worked because [Gia] completely stopped thinking about confronting [Wanda].
>
> . . . .

> If [Wanda]'s goal was to distract from whatever her mom was confronting her about in that first text, she was certainly successful. Why do I mention these things, the texts, the context of the disclosure, [Wanda]'s dislike of [defendant]? I mention it because they could explain why [Wanda] would make this story up.

During the trial, defendant offered testimony and evidence to support the defense theory that Wanda concocted the sexual assault allegations against defendant to prevent a confrontation with her mother about certain improper or inappropriate conduct. The actual conduct that Gia sought to address with Wanda did not preclude defense counsel from arguing Wanda had a reason to lie to her mother to avoid a confrontation.

Under these circumstances, we discern no abuse of discretion in the judge's exclusion of the testimony regarding Wanda's kissing her boyfriend under N.J.R.E. 403. The specific conduct, two teenagers kissing, had minimal probative value. On the other hand, the potential prejudice associated with such testimony clearly outweighed any limited probative value.

Based on our review of the record, we reject defendant's argument that he was deprived of the right to present a complete defense. To the contrary, defense counsel vociferously argued Wanda had more than one motive or reason to

24

invent the sexual assault allegations against defendant. However, the jury was unpersuaded by those arguments.

## II.

We next consider defendant's argument the judge erred by allowing testimony which improperly bolstered Wanda's credibility. Defendant asserts the State elicited testimony from Gia that Wanda "repeatedly swore to [Gia] that she was telling the truth" and this testimony improperly bolstered Wanda's credibility. He further argues Wanda's credibility was improperly bolstered when the prosecutor argued in summation that Wanda's allegations were credible because an investigator "look[ed] into" the allegation.

## A.

We first address defendant's arguments regarding Gia's testimony. We reject his arguments that Gia's testimony improperly bolstered Wanda's credibility.

A witness may not "express a view on the ultimate question of guilt." See State v. C.W.H., 465 N.J. Super. 574, 600 (App. Div. 2021) (citation removed) (citing State v. Bethune, 121 N.J. 137, 148 (1990) and quoting State v. McLean, 205 N.J. 438, 461 (App. Div. 2011)).

On appeal, defendant argues the State improperly allowed Gia to opine on the ultimate jury issue—defendant's guilt.

At trial, Gia testified as follows on direct examination:

> Q.   . . . [C]an you tell us if you know who raped your daughter?
>
> A.   The person that was my partner.
>
> Q.   And th[at] person . . . , do you know his name?
>
> A.   Yes.
>
> Q.   What is his name?
>
> A.   [G.S.].

Additionally, the State elicited through Gia's testimony that Gia asked Wanda several times to swear she was telling the truth. Further, on direct examination, Gia explained that when speaking with Wanda on the telephone, her daughter sounded "nervous [and] frail."

Defendant did not object to Gia's testimony during the trial. Thus, we review for plain error. R. 2:10-2. A plain error is one "clearly capable of producing an unjust result." State v. G.E.P., 243 N.J. 362, 389 (2020) (quoting R. 2:10-2). "In the context of a jury trial, the possibility must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it

otherwise might not have reached.'"  Id. at 389-90 (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).

Defense counsel vigorously cross-examined Gia on the issue of defendant's guilt.  During cross-examination, Gia confirmed the following:  she "never observed [defendant] sexually abusing [Wanda]"; she "never heard any sexual noises coming from [Wanda]'s bedroom in the middle of the night"; she "never heard [Wanda] crying or yelling in the middle of the night"; Wanda "never complained about any injury[,] such as pain or bleeding[,] that would have suggested . . . that she was being sexually abused"; and "[t]he first time that [Gia] ever learned anything about an allegation of sexual abuse was when [Wanda] told it to [Gia] on August 27, 2018."

Having reviewed the record, we are satisfied the State did not elicit Gia's testimony for the purpose of offering lay opinion testimony on defendant's guilt or to improperly bolster Wanda's credibility.  The State's direct examination of Gia established the timeline related to Wanda's disclosure of defendant's sexual abuse and the circumstances surrounding the disclosure of the allegation.  At no time did Gia testify she believed Wanda's allegations were truthful or credible.

B.

Defendant further asserts the judge erred in permitting the State to improperly bolster Wanda's credibility by suggesting during closing argument that Wanda's allegation had been "looked into" by an investigator before defendant was charged. We reject this argument.

The State may not personally vouch for a witness's credibility or otherwise "refer[] to matters outside the record" to bolster that witness's credibility. State v. Marshall, 123 N.J. 1, 156 (1991). However, "[a] prosecutor is not forced to idly sit as a defense attorney attacks the credibility of the State's witnesses; a response is permitted." State v. Hawk, 327 N.J. Super. 276, 284 (App. Div. 2000). "Generally, remarks by a prosecutor[] made in response to remarks by opposing counsel are harmless." Id. at 284-85 (quoting State v. C.H., 264 N.J. Super. 112, 135 (App. Div. 1993)).

During closing argument, defense counsel stated:

> [The State's witnesses] conducted a thorough investigation[,] looking for evidence in all the places you would expect to find it. And yet they found nothing.
>
> . . . .
>
> [Detective Orland] is someone who knows what she's doing. . . . This is someone experienced, who knows what to do, where to look, . . . what witnesses to talk to,

and what steps to take to try to prove a charge. Why do I say all this? Because . . . this experienced detective[,] whose job . . . is to find evidence for the prosecutor if any such evidence exists[,] found nothing.

And you heard what steps she took. She interviewed multiple witnesses. She interviewed [Wanda]. She interviewed [Wanda]'s brothers . . . . She interviewed [Gia]. She interviewed [Amy]. She asked every single one of these people if they observed [defendant] sexually abuse [Wanda]. She looked for anyone who could corroborate an actual detail of [Wanda]'s story. And not one of them saw [defendant] do anything.

Detective Orland visited [the] apartment, visited the scene. She looked around the apartment, went through all the rooms, [Wanda]'s bedroom, [Gia]'s bedroom. She took photos throughout the apartment so they could be used here in court. Detective Orland collected every single piece of physical evidence that we would want her to collect.

She collected [Wanda]'s bed sheets, her blankets, pillows, stuff[ed] animals. She told us that [Wanda]'s underwear was collected by Nurse Hatt. [Wanda]'s DNA was collected. [Defendant]'s DNA was collected. All of these items were sent to the lab[,] where they were tested to see if [defendant]'s DNA was present, [or] if semen was present. . . .

But . . . there was none. There was no DNA. There was no semen. No physical evidence present whatsoever. Detective Orland didn't miss a thing. She used her experience looking in places where you would expect to find evidence of sexual assault and she found no evidence.

In her closing argument, the prosecutor responded:

29

A-3225-21

[L]et's talk about what [d]efense counsel essentially said as to [the State's] story. I have an allegation. Well, that's true I have an allegation. That's not facts. And guess what happens with an investigation, the investigator looks at that allegation, looks into the facts. Every crime in this courtroom, in this courthouse, in the state, . . . in this country begins with an allegation. Every single one. The allegation . . . gets investigated. It gets . . . looked into. If there's charges filed and the allegation makes its way into a courtroom as this case has . . . , the minute a single witness walks through those doors and takes that stand[,] that's evidence. Testimonial evidence is exactly what it is.

Reviewed in the context of this trial, the State's remarks during closing argument were not offered to bolster Wanda's credibility. While the prosecutor stated Wanda's allegations had been "looked into," the jury heard testimony regarding law enforcement's investigation into Wanda's allegations against defendant. The prosecutor simply explained to the jury the process associated with investigating a sexual assault allegation. More importantly, the jury heard testimony that the results of the investigation by law enforcement found no physical evidence to support Wanda's allegation against defendant. And defense counsel's summation emphasized the absence of any physical evidence despite law enforcement's investigative efforts.

Having reviewed the record, we are satisfied the prosecutor's remarks during closing did not improperly bolster Wanda's credibility, particularly

30

because the investigation revealed no physical evidence of any sexual assault. Thus, the State's alleged bolstering of Wanda's testimony by noting her allegations were investigated by law enforcement was incapable of producing an unjust result on this record.

III.

We next address defendant's argument the judge erred in allowing the State to elicit testimony regarding the need for a court order to obtain defendant's DNA sample. He contends the testimony violated his Fourth Amendment right to be free from unreasonable searches. Defendant also asserts the testimony wrongfully implied he had a guilty conscience. We reject these arguments.

"[B]ecause suspects have a constitutional right to refuse consent to a search, it is improper to allow a refusal to consent to be used at trial as evidence suggesting guilt or guilty knowledge." State v. Tung, 460 N.J. Super. 75, 95-96 (App. Div. 2019) (citing U.S. v. Thame, 846 F.2d 200, 206-07 (3d Cir. 1988)). Accordingly, "[i]n a sexual assault case, [if] the defendant . . . refuse[s] to voluntarily provide a DNA sample . . . [,] '[t]he jury should not be allowed to infer guilt' from [the] defendant's refusal to consent to a warrantless search." Id. at 96 (quoting State v. Gauthier, 298 P.3d 126, 131 (Wash. Ct. App. 2013)).

Here, Detective Boreland testified on direct examination that defendant's buccal swab was obtained by a court order rather than provided voluntarily. Defendant failed to object to the detective's testimony on this issue at trial. Therefore, we review for plain error. R. 2:10-2; see also Tung, 460 N.J. Super. at 98 (reviewing admission of "references to [the] defendant's refusal to consent to a search" for plain error).

Defense counsel also chose not to cross-examine Detective Boreland regarding defendant's refusal to consent to the buccal swab. The State never referred to the detective's testimony on this issue during closing argument. Moreover, the detective's reference to defendant's refusal was solitary and fleeting.

Further, the jury heard testimony that the results of Wanda's sexual assault kit examination found no DNA from defendant. The jury also heard defendant's DNA was not found on any of the items from Wanda's bedroom. We are satisfied the testimony regarding defendant's court ordered DNA sample was not such that it would lead the jury to a result it may not have otherwise reached. Thus, the admission of this single brief statement did not constitute plain error.

32

IV.

Defendant next argues his right to due process was violated by admitting fresh complaint evidence without first permitting him to examine Wanda at the fresh complaint hearing as to the "details" and "circumstances" of the complaints she made to Gia and Amy regarding defendant's sexual assaults. Defendant claims Wanda's testimony was relevant to rebut the State's evidence that the complaints had been made and qualified as proper fresh complaint evidence. Defendant asserts his attorney sought to cross-examine Wanda regarding the details of the alleged sexual assaults as part of his trial strategy to show Wanda never made the disclosures. He claims the judge abused her discretion in failing to permit his attorney to question Wanda during the fresh complaint evidentiary hearing and thus deprived him of the right to a fair trial. We reject these arguments.

Ordinarily, a third party's testimony about a victim's out-of-court description of an alleged sexual assault is inadmissible hearsay evidence. N.J.R.E. 802. Under the fresh complaint rule, the State is allowed to present "evidence of a victim's complaint of sexual abuse, [which is] otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." State v. R.K., 220 N.J. 444, 455

(2015). However, "the trial court is required to charge the jury that fresh complaint testimony is not to be considered as substantive evidence of guilt, or as bolstering the credibility of the victim; it may only be considered for the limited purpose of confirming that a complaint was made." Id. at 456 (citing State v. Bethune, 121 N.J. 137, 147-48 (1990)).

"[T]o qualify as fresh complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after the alleged assault, to a person the victim would ordinarily turn to for support." Id. at 455 (citing State v. W.B., 205 N.J. 588, 616 (2011)). Where the victim is a child, the fresh complaint rule must be applied flexibly "'in light of the reluctance of children to report a sexual assault . . . .'" W.B., 205 N.J. at 618 (quoting State v. P.H., 178 N.J. 378, 393 (2004)).

Here, the judge found Wanda made disclosures regarding defendant's sexual assaults to Gia and Amy. The judge further concluded Wanda's statements were made spontaneously and voluntarily, within a reasonable time after the alleged assaults, and to persons who Wanda would ordinarily turn to for support.

Defense counsel was well aware of Amy and Gia's anticipated trial testimony based on their testimony at the fresh complaint evidentiary hearing.

Defense counsel vigorously cross-examined Amy and Gia about their recollections regarding Wanda's disclosure of defendant's sexual abuse to highlight inconsistencies between their trial testimony and fresh complaint hearing testimony. Additionally, defense counsel extensively cross-examined Wanda at trial.

Moreover, the judge gave the jury a detailed instruction regarding the use of fresh complaint testimony consistent with the Model Jury Charge. See Model Jury Charges (Criminal), "Fresh Complaint" (rev. Feb. 5, 2007). The judge told the jury the limited purpose of fresh complaint testimony and that the testimony could not be considered as substantive evidence of defendant's guilt or Wanda's truthfulness or credibility.

On this record, we are satisfied defendant's right to due process was not violated by the lack of Wanda's testimony at the fresh complaint hearing.

V.

Defendant next argues the cumulative effect of the foregoing errors deprived him of due process and a fair trial. Even where a defendant alleges multiple errors, "the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." State v. Weaver, 219 N.J. 131, 155

(2014). Because we are satisfied there were no errors, individually or cumulatively, we reject defendant's cumulative error argument.

## VI.

We next consider defendant's sentencing arguments and request for a remand on the sentencing issues. He contends the judge erred in weighing the aggravating and mitigating factors. He further asserts the judge failed to consider his ability to pay restitution. Additionally, defendant contends the judge abused her discretion in setting the amount of the SCVTF penalty.

## A.

Defendant argues the judge double-counted the elements of the offense in applying aggravating factor nine concerning specific and general deterrence, N.J.S.A. 2C:44-1(a)(9), and declining to apply mitigating factor nine, N.J.S.A. 2C:44-1(b)(9). We disagree.

We are "bound to affirm a sentence, even if [we] would have arrived at a different result, as long as the trial court properly identifies and balances [the] aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. Grate, 220 N.J. 317, 337 (2015). To accord such deference, the sentencing court is required to "identify the relevant aggravating and mitigating factors, determine which factors are supported by a

preponderance of [the] evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence."  State v. O'Donnell, 117 N.J. 210, 215 (1989).

To apply aggravating factor nine, a court must find a "need for deterring the defendant and others from violating the law."  N.J.S.A. 2C:44-1(a)(9).  The sentencing court must conduct a "'qualitative assessment' of the risk of recidivism," including "determinations that go beyond the simple finding of a criminal history and include an evaluation and judgment about the individual in light of his or her history."  State v. Fuentes, 217 N.J. 57, 78 (2014) (quoting State v. Thomas, 188 N.J. 137, 153 (2006)).  "[D]emands for deterrence are strengthened in direct proportion to the gravity and harmfulness of the offense."  Id. at 79 (quoting State in re C.A.H. & B.A.R., 89 N.J. 326, 337 (1982)).  "If the court determines . . . that aggravating factor nine applies, it should address both general and specific deterrence."  Id. at 81.

In applying aggravating factor nine, the judge stated:

> I think aggravating factor number nine . . . should [be] take[n] into consideration.  . . . [T]he [c]ourt has a strong need to deter [] [d]efendant . . . and others in society from committing these types of offenses against children.  They are amongst . . . the most vulnerable that we have in our society.

Having reviewed the record, we are satisfied the judge did not impermissibly double-count in applying aggravating factor nine. The judge found defendant's abuse of Wanda happened more than once and would have continued if Wanda remained silent. Additionally, the judge found the need to specifically deter defendant from further abuse of Wanda as well as general deterrence against defendant's potential to abuse other child victims in the community.

Nor did the judge err in declining to apply mitigating factor nine, "[t]he character and attitude of [] defendant indicate that [he] is unlikely to commit another offense." N.J.S.A. 2C:44-1(b)(9). The judge noted defendant's lack of criminal history and positive attributes cited by friends and family. However, the judge stated, "it's hard . . . to determine whether these are circumstances unlikely to reoccur" because the assaults "happened on more than one occasion, and had the victim remained silent, reasonably-speaking it likely would have continued."

We are satisfied there was sufficient credible evidence in the record for the judge to apply aggravating factor nine and reject mitigating factor nine, and she did not impermissibly double-count in applying aggravating factor nine.

We next consider defendant's argument that the judge erred in failing to consider defendant's ability to pay restitution to the victim in the amount of $20,630.66. Again, we disagree.

Because restitution is "rehabilitative in nature," a sentencing court must determine "the amount the defendant can pay and the time within which he can reasonably do so" before ordering restitution. State v. Paladino, 203 N.J. Super. 537, 547 (App. Div. 1985) (citing State v. Harris, 70 N.J. 586, 592-93 (1976) and State in re D.G.W., 70 N.J. 488, 504-05 (1976)). A sentencing court must "conduct at least a summary hearing" on the matter before entering such an order. Ibid.

In discussing mitigating factor six, N.J.S.A. 2C:44-1(b)(6), defendant's willingness to provide restitution or "participate in a program of community service," the judge and defense counsel engaged in the following colloquy:

> THE COURT: I know [defense counsel] asked the [c]ourt to consider number six. And I know that the State also . . . indicat[ed] that the [c]ourt should not take that into consideration. [Defendant has] indicated . . . that he has no income or assets.
>
> So[,] I'm not quite sure what to do with this. Is he willing to provide restitution for [the] Victims of Crime Compensation Board? It's a total of $20,630.66. If he

tells me that he's going to pay the restitution, I'll take that into consideration. . . .

. . . .

[DEFENSE COUNSEL]: Your Honor, [defendant] is willing to pay back restitution. And I'll note for the [c]ourt that while he is in prison, he will be working and earning money[,] [a]nd that the restitution and fines get garnished from his wages. So there certainly will be a way for him to pay it back.

THE COURT: Okay. All right. So[,] I'll take mitigating factor six into consideration on behalf of [] [d]efendant.

Here, defense counsel expressly requested consideration of mitigating factor six. Notwithstanding the judge's concern regarding defendant's ability to pay restitution, defendant did not request an ability to pay hearing. Instead, defendant's attorney asked the judge to apply mitigating factor six and permit defendant to pay restitution through the garnishment of his prison wages.

On this record, the judge engaged in a "summary hearing" on defendant's ability to pay prior to imposing restitution. Based on defense counsel's representation at the sentencing hearing, the judge properly determined defendant had the ability to pay restitution based on the wages he will earn while incarcerated.

40

## C.

Defendant argues the judge failed to provide a statement of reasons in support of imposing the maximum statutory SCVTF penalty for each offense. We agree with defendant on this issue.

N.J.S.A. 2C:14-10 provides "a person convicted of a sex offense, as defined in [N.J.S.A. 2C:7-2], shall be assessed a penalty for each such offense not to exceed: (1) $2,000, when the conviction is a crime of the first degree; [and] (2) $1,000, when the conviction is a crime of the second degree."

In reviewing the record, the judge mistakenly believed she was statutorily required to impose the maximum penalty amount. Additionally, the judge failed to consider the required factors in assessing defendant's SCVTF penalty. Thus, we are constrained to vacate and remand the portion of the judgment of conviction limited to the SCVTF penalty for the judge to set forth reasons in support of the penalty imposed after considering the required factors.

To the extent we have not addressed any of defendant's remaining arguments, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed as to the conviction, sentence, and restitution. Remanded for proceedings consistent with this opinion on the amount of the SCVTF penalty. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3225-21