# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0561-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOSEPH W. MCCAIN,

     Defendant-Appellant.

_____

Argued December 10, 2024 – Decided December 30, 2024

Before Judges Gilson, Firko and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 16-10-1301.

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Morgan A. Birck, Assistant Deputy Public Defender, of counsel and on the briefs).

K. Charles Deutsch, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; K. Charles Deutsch, of counsel and on the brief).

PER CURIAM

Defendant Joseph W. McCain appeals from his jury trial conviction for three counts of second-degree sexual assault of a victim under the age of thirteen, N.J.S.A. 2C:14-2(a)(1); three counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b); and one count of second-degree endangering the welfare of a child, N.J.S.A. 2C:14-4(a)(1).  The court sentenced defendant to an aggregate term of nineteen years of imprisonment with a period of parole ineligibility, Megan's Law requirements, N.J.S.A. 2C:7-1 to -23, parole supervision for life (PSL), N.J.S.A. 2C:43-6.4, and a Nicole's Law restraining order, N.J.S.A. 2C:14-12 and 2C:44-8.  Defendant challenges his conviction and sentence and raises the following points for our consideration:

> POINT I
>
> [DEFENDANT'S] RIGHT TO PRESENT A COMPLETE DEFENSE WAS INFRINGED WHEN THE TRIAL COURT REFUSED TO ALLOW HIM TO PRESENT EVIDENCE AT TRIAL OF J.F.'S[1] PRIOR SEXUAL ABUSE ALLEGATIONS TO EXPLAIN WHY SHE MIGHT HAVE IMAGINED OR FABRICATED THE ALLEGATIONS AGAINST [HIM].

---

[1] The use of initials and a pseudonym are intended to protect the confidentiality and identity of the child victim pursuant to N.J.S.A. 2A:82-46(a) and Rule 1:38-3(c)(9).

POINT II

THE TRIAL COURT ERRED IN ADMITTING THE FRESH-COMPLAINT TESTIMONY, AS IT WAS NOT "FRESH."

POINT III

DEFENDANT COULD NOT HAVE BEEN GUILTY OF SECOND-DEGREE ENDANGERING, AND EVEN IF HE COULD HAVE, THE TRIAL COURT ERRED IN FAILING TO CHARGE THE JURY ON THE LESSER-INCLUDED OFFENSE OF THIRD-DEGREE ENDANGERING. (Not raised below).

POINT IV

REPEATED INSTANCES OF PROSECUTORIAL MISCONDUCT DENIED DEFENDANT A FAIR TRIAL.

POINT V

THE SENTENCE WAS EXCESSIVE, AS THE YARBOUGH[2] ANALYSIS WAS INADEQUATE AND THE TRIAL COURT FAILED TO PROPERLY FIND AND WEIGH THE AGGRAVATING AND MITIGATING FACTORS.

We reject defendant's arguments raised in Points I, II, III, and IV and affirm. However, as to Point V, we remand for a new sentencing hearing.

---

[2] State v. Yarbough, 100 N.J. 627 (1985).

3

# I.

## Factual Background

We derive the following facts from the record. At trial, J.F. testified that in 2011, when she was eleven years old, she was living with her mother, D.F., and her infant brother in Pennsylvania. J.F. described her relationship with her mother as "strained" and stated that her mother emotionally and physically abused her. In the summer of 2012, D.F. began dating defendant, who was then forty-one years old.

J.F. testified that she first met defendant in either late July or August 2012 when her mother brought her to his home in Ridgewood for the weekend. J.F. explained that she, her mother, and defendant slept in his bed, with her mother positioned between J.F. and defendant. J.F. recalled that D.F. brought her to visit defendant five to ten times during D.F.'s and defendant's relationship. J.F. noted that defendant's son was sometimes present during her and her mother's visits.

Thereafter, D.F. and defendant ended their relationship. However, J.F. remained in contact with defendant, and the two exchanged text messages almost daily and occasionally spoke through headsets or chat rooms while playing videogames together. Eventually, J.F. asked defendant to visit her on the

weekends without her mother. J.F. explained that defendant would pick her up in his car on Friday evenings, drive them approximately one-and-a-half hours to his home in Ridgewood, then drive her back to Pennsylvania on Sunday evenings.

J.F. described that defendant would play video games with her, take her to the movie theater, the bowling alley, and provide her with meals. She testified that no one else was present at defendant's house during her visits and that she would sleep in defendant's bed with him.

J.F. testified that defendant began sexually abusing her the first time she stayed over his home without her mother. J.F. alleged that she was "laying on [her] left side" in his bed with him and "moving backwards" when defendant "started to rub [her] right torso side and [her] stomach and vagina." She recounted that defendant then asked her if she had "ever done anything like [that] before." When J.F. responded that she had, defendant undressed her and penetrated her vaginally.

Afterward, J.F. went to the bathroom and noticed she was experiencing pain in and was bleeding from her vagina. When J.F. told defendant about the blood, he allegedly responded: "I thought you've done something like this before." J.F. testified she had not, in fact, engaged in sexual intercourse prior

5

to that time, and she knew the blood was not from her period, which she had first experienced approximately two years earlier.

J.F. testified that the second instance of sexual abuse occurred on a Sunday at defendant's home. J.F. explained that after she became upset about having to return home to Pennsylvania, defendant picked her up, brought her to his bed, began kissing and touching her, and then penetrated her vagina with his penis. J.F. testified that although she could not recall the specifics of other incidents, the penile and vaginal penetration happened almost every weekend at defendant's house, from approximately September 2012 to early January 2013.

J.F. also testified that on "less than five " occasions, defendant bathed her from outside the tub, dried her off with a towel, and applied lotion to her body, including her breasts, buttocks, and vagina, while they watched television. J.F. stopped visiting defendant's home in early January 2013 when her mother's boyfriend at the time advised against it. That same year, J.F. disclosed to C.B., a childhood friend, that she "lost [her] virginity" to defendant.

Law Enforcement Investigation and Defendant's Statements

In January 2016, Kristin Fetcho interviewed J.F. at the Northeast Pennsylvania Child Advocacy Center. At that point, J.F. was living with her aunt and uncle after child protective services removed her from D.F.'s care. J.F.

6

disclosed to Fetcho that she had been repeatedly sexually assaulted by her older cousin, J.L., when she was between the ages of twelve and fourteen and while she was under the influence of narcotics. J.F. further described how J.L.'s friend, Cory, pulled her pants down, forced her to get on her hands and knees, forcibly penetrated her vagina with his penis, and ejaculated on her back in her bedroom. J.F. also disclosed that she had been sexually assaulted by one of her mother's ex-boyfriends, who exposed himself to her and groped her, when she was seven years old. Lastly, J.F. informed Fetcho about defendant's sexual abuse committed against her.

That same month, Detective Bradford Arnold Waudby of the Bergen County Prosecutor's Office was informed of J.F.'s allegations against defendant and began an investigation. During his investigation, Waudby learned that defendant was then living in Orange County, Florida. In March 2016, Waudby and another sergeant travelled to Florida to question defendant. The interview, which was recorded and played for the jury during trial, occurred on March 31, 2016, at the Orange County Sheriff's Department Headquarters in Orlando.

Defendant was advised of and waived his Miranda rights prior to giving his statement.[3] Defendant explained that he had dated D.F. for approximately

---

[3] Miranda v. Arizona, 384 U.S. 436 (1980).

A-0561-22

three months, and that after they broke up, he would drive with his son and his son's friend to Pennsylvania to pick up J.F. and bring her to his home in New Jersey "like every other weekend" for approximately five months. Defendant confirmed that he would take J.F. out to dinner, to bowl, and to the movies. He initially stated that J.F. would sleep in his bed, he would sleep on the floor in his living room, and his son would sleep on an air mattress in the living room. He also explained that his son or his son's friend were always present when J.F. slept over on the weekends.

When confronted with the sexual abuse allegations, defendant initially denied touching or sleeping in the same bed as J.F., however, he eventually admitted to laying and sleeping in the same bed when she could not fall asleep. Defendant recalled an incident where J.F. "backed up to [him]" in the bed because she could not sleep. Initially, defendant stated that he stopped J.F. from sliding over toward him, questioned her intentions, embraced her, and then reassured her that she did not "have to do stuff like [that]."

Ultimately, defendant explained that when J.F. "backed up" to him, he was half asleep and his hand "might've been on her breast, chest, or something," and that when he asked her whether she had "done something like [that] before," she

8

responded that she had. Defendant also acknowledged that he had "kissed her on her forehead" during that encounter.

Defendant repeatedly denied any vaginal or penile penetration, however, he recalled there was an incident when J.F. was bleeding in the bathroom and that she told him it was her period. Eventually, defendant stated that it was possible that in a "sleep state," while dazed on medication, he had touched J.F.'s vagina and held her breasts. Defendant later recanted what he said and claimed he only laid on top of the covers until J.F. fell asleep and then he would get on the floor. Defendant also explained that he was forty-one years old at the time.

In June 2016, Trooper Mark Pizzuti of the Pennsylvania State Police interviewed defendant. Defendant again received and waived his Miranda rights. During this interview, defendant denied ever sleeping in the same room or bed as J.F. without D.F. present. He also indicated that J.F. only stayed at his home without D.F. one weekend per month approximately three or four times in August 2012. Defendant told Pizzuti that he shared a bed with both D.F. and J.F. Defendant repeatedly stated that he never touched J.F., and that on one occasion, he awoke to find J.F. in his bed after D.F. had left the bed in the morning to get breakfast. Defendant denied that J.F. bled after the encounter. Defendant told Pizzuti, as he claimed to have told Waudby, that "anything can

9

happen in your sleep." An audio recording of defendant's statements to Pizzuti was also played for the jury.

On October 24, 2016, a Bergen County grand jury returned a six-count indictment against defendant charging him with (1) two counts of first-degree aggravated sexual assault for the penile/vaginal and digital penetration of J.F., a victim under thirteen years old, N.J.S.A. 2C:14-2(a)(1) (counts one and two); (2) three counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b) (counts three, four, and five); and (3) one count of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (count six).

## Pre-Trial Motions

### A.

### Fresh Complaint Testimony

In August 2018, the State moved to admit the fresh complaint testimony of C.B. On February 14, 2019, the court held a fresh complaint hearing, at which C.B. testified on behalf of the State. C.B., who was eighteen years old at the time of her testimony, stated that she first met J.F. in 2010, when they both were ten years old, and they became friends in 2013, when they both were thirteen years old. J.F. moved closer to where C.B. lived in Pennsylvania, and they

began attending the same school. C.B. described that she and J.F. were "very close" and "[b]est friends."

C.B. testified that in 2013, while at J.F.'s house in her room, J.F. told her that she "had lost her virginity" to J.F.'s mother's ex-boyfriend, defendant, at his home in New Jersey. C.B. recalled that J.F. told her she was eleven years old at the time of the alleged abuse and that J.F. did not go into detail regarding the specifics of what transpired. C.B. also testified that J.F. had just argued with her mother and was "venting" to her when she made the disclosure. In that regard, C.B. explained that she did not ask J.F. any questions before or after J.F. disclosed the alleged abuse. C.B. described J.F.'s demeanor at the time of the disclosure as "very anxious" and "frustrated."

On March 11, 2019, in both an oral and a written opinion, the court granted the State's motion to admit the fresh complaint testimony. The court found that C.B.'s testimony was "highly credible" given her recall of her relationship with J.F. and the timing and substance of J.F.'s disclosures. The court then considered the five factors set forth in State v. Bethune, 121 N.J. 137 (1990), to determine if J.F.'s statements to C.B. qualified as fresh complaint testimony pursuant to N.J.R.E. 803(c)(2). Those factors include: (1) the age of the child; (2) the child's relationship with the interviewer; (3) the circumstances under which the

11

interrogation took place; (4) whether the child initiated the discussion; and (5) the type of questions asked, whether the questions were leading, and the specificity of the questions regarding the alleged abuser and the acts alleged. Bethune, 121 N.J. at 145.

The court determined that (1) J.F. was thirteen years old at the time of the disclosure to C.B, (2) J.F. and C.B. were best friends and C.B. was someone J.F. "would naturally turn to," (3) the conversation took place in J.F.'s bedroom when J.F. was frustrated with her mother, (4) J.F. initiated the conversation, and (5) C.B. asked no further questions of J.F. after the disclosure. The court found that given J.F.'s age, she had made the disclosure within a reasonable time after having no contact with defendant and that J.F.'s disclosure was spontaneous. Accordingly, the court concluded that J.F.'s statements to C.B. qualified as fresh complaint testimony under N.J.R.E. 803(c)(2).

B.

J.F.'s Sexual Assault Allegations Against Other Individuals

On July 1, 2019, defendant moved to admit evidence of sexual assault allegations that J.F. had made against individuals other than defendant. Defendant sought to admit allegations J.F. had made against J.L, J.F.'s cousin, J.L.'s friend Cory, and J.F.'s mother's other ex-boyfriend. Defendant maintained

12

the assault allegations against other individuals were relevant to establish J.F.'s "state of mind" when she made her allegations against defendant, and addressed the issue of credibility. On July 8, 2019, after a Rule 104 hearing and oral argument, the court denied defendant's motion.[4]

In an oral decision, the court held that the evidence of the sexual assault allegations against all three individuals should be excluded under the Rape Shield Law, N.J.S.A. 2C:14-7. First, the court found that none of the allegations had any probative value because they concerned sexual assaults that occurred either before or after the allegations J.F. made against defendant. Specifically, the court explained that mother's ex-boyfriend allegedly exposed himself to J.F. when she was seven years old, which was approximately four years prior to when J.F. alleged defendant took her virginity.

In addition, the court noted the alleged sexual assaults by J.L. and Cory occurred when J.F. was between the ages of twelve and fourteen. The court then reasoned that any testimony concerning the allegations would be highly prejudicial to J.F., confuse the jury, and constitute an unwarranted invasion of J.F.'s privacy.

---

[4] Defendant also moved to compel discovery of the sexual assault allegations under Brady v. Maryland, 373 U.S. 83 (1963), which was denied after the Rule 104 hearing. That ruling is not challenged on appeal.

A-0561-22

## C.

## The Trial

A jury trial was held from July 30, 2019 to August 2, 2019. The State called four witnesses: J.F., Waudby, C.B., and Pizzuti. Defendant did not testify or call any witnesses to testify on his behalf.

At trial, J.F. testified that in 2012, she was in the sixth grade. Her relationship with her mother was physically and emotionally abusive, and J.F. was tasked with cleaning the home and caring for her infant brother.

J.F. described her introduction to defendant and how the two slept in his bedroom. J.F. testified that defendant "was very nice to [her]," and paid more attention to her than D.F.'s prior boyfriends. After D.F. and defendant ended their relationship, J.F. testified that he gave her a headset so they could communicate in a video game chat room and text on their cell phones. The contact was "about every day."

During the weekend visits, J.F. essentially repeated her fresh statements about how she spent time with defendant. According to J.F., she did not want to return home because her time spent with defendant "was kind of like a breath of fresh air" from her mother. J.F. stated that the first time defendant sexually abused her was at his house when D.F. was not there. J.F. explained that she

14

was in defendant's bed, he "started to rub [her] right torso side," her "stomach and vagina," and then he "pulled off [her] pants," inserted his penis into her vagina, and "it didn't finish until he ejaculated."

J.F. testified that defendant asked her if she had ever done anything like this before and she said, "I have." At trial, J.F. stated that she had not had sex previously and had been "confused" by his question. On another occasion, J.F. recalled defendant picked her up in his arms, brought her to bed, and started "kissing . . . and touching" her intensely and passionately. She did not want to go home, and defendant sexually assaulted her.

J.F. also testified about instances when defendant bathed her, groped her breasts, buttocks, vagina, and legs, and dried her off with a towel. J.F. testified that defendant penetrated her vagina with his penis "every time" she stayed at his home.

J.F. testified that defendant told her not to tell anyone about the sexual abuse. J.F. maintained the secret because she "didn't have people to tell" and was afraid to tell her mother. Because J.F. had recently moved, she claimed she did not have friends at school.

On cross-examination, defense counsel elicited testimony from J.F. on how she did not disclose all of the details regarding defendant's abuse that she

15

later told Waudby.  In particular, J.F. admitted in cross-examination that she did not advise Fetcho about defendant telling J.F. not to mention the abuse to anyone because she "[had] other instances on [her] head" during Fetcho's interview and needed time to "reprocess" her memories.

Based on J.F.'s testimony on cross-examination, defense counsel renewed the motion to admit evidence of J.F.'s other allegations of sexual abuse.  The court denied the motion, ruling that J.F.'s allegations of sexual abuse that predated defendant's abuse had "no resemblance" to her allegations against defendant.  The court noted that J.F. testified that she never had sex before defendant assaulted her and there was no evidence to suggest J.F.'s understanding of sex predated that assault.  The court reasoned that by the time J.F. spoke to law enforcement, she was mature enough to understand the meaning of sex.

C.B. testified that J.F. did not give a lot of specifics about defendant's abuse but indicated he "raped her."  C.B. stated that J.F. asked her not to disclose the abuse to anyone and C.B. honored that request.

Waudby testified about his investigation of J.F.'s allegations against defendant and his interview of defendant which took place in Florida.  Pizzuto

testified about his interview of defendant at the Bergen County Prosecutor's Office.

On August 5, 2019, the jury reached a verdict. On counts one and two, the jury was deadlocked on the charges of first-degree aggravated sexual assault of J.F. by penile/vaginal penetration and first-degree aggravated sexual assault of J.F. by digital penetration. The jury found defendant guilty on all the other counts.

D.

The Sentencing Hearing

Defendant did not appear at his original sentencing, which was scheduled for November 22, 2019. A bench warrant was issued for his arrest. In 2021, defendant was arrested in California on a Pennsylvania warrant. In 2022, after waiving extradition, defendant was transported back to New Jersey. On September 16, 2022, the court sentenced defendant.

On count three, for intentionally touching J.F.'s breasts, defendant was sentenced to six years' imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On count four, for touching J.F.'s buttocks, defendant was sentenced to six years' imprisonment to run concurrently to the sentence for count three. On count five, for intentionally touching J.F.'s vagina,

defendant was sentenced to eight years' imprisonment, subject to NERA, to run consecutively to the sentence on count three. On count six, defendant was sentenced to five years' imprisonment to run consecutively to count five. This appeal followed.

## II.

We review a trial court's decision on evidentiary rulings for a "palpable abuse of discretion." State v. R.Y., 242 N.J. 48, 64 (2020) (quoting Brenman v. Demello, 191 N.J. 18, 31 (2007)). In that regard, a "trial court's decision to grant or deny an evidentiary application will generally be upheld unless it is 'so wide of the mark' as to result in manifest injustice." State v. J.D., 211 N.J. 344, 354 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)).

### A.

### J.F.'s Prior Sexual Abuse Allegations

New Jersey's Rape Shield Law, N.J.S.A. 2C:14-7, enacted in 1978, places "restrictions on a defendant's ability to introduce evidence of [a] rape victim's past sexual conduct" in prosecutions for certain sexual offenses, including aggravated sexual assault, sexual assault, and endangering the welfare of a child. J.D., 211 N.J. at 355 (quoting Assemb. Judiciary, L. & Pub. Safety Comm. Statement to A. 677 (Jan. 20, 1994), reprinted in N.J.S.A. 2C:14-7 note);

N.J.S.A. 2C:14-7(a). Under the statute, "sexual conduct" includes "any conduct or behavior relating to sexual activities of the victim," including "previous or subsequent experience of sexual penetration or sexual contact, use of contraceptives, sexual activities reflected in gynecological records, living arrangement[,] and life style." N.J.S.A. 2C:14-7(f).

The statute aims to "deter the unwarranted and unscrupulous foraging for character-assassination information about the victim." J.D., 211 N.J. at 355 (quoting State v. Schnabel, 196 N.J. 116, 128 (2008)). In that regard, the Rape Shield Law prohibits evidence of a victim's previous sexual conduct unless the court finds the evidence offered by defendant is "relevant and highly material," "meets the requirements of subsections [c] and [d]" of N.J.S.A. 2C:14-7, and "the probative value of the evidence offered substantially outweighs its collateral nature or probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim." N.J.S.A. 2C:14-7(a).

Under subsection (c), evidence of previous sexual conduct with persons other than the defendant is considered relevant under the statute if "it is material to proving the source of semen, pregnancy[,] or disease." N.J.S.A. 2C:14-7(c). Under subsection (d), evidence of the victim's previous sexual conduct with the

19

defendant is relevant if "it is probative of whether a reasonable person, knowing what the defendant knew at the time of the alleged offense, would have believed that the alleged victim freely and affirmatively permitted the sexual behavior." N.J.S.A. 2C:14-7(d).

Our Supreme Court, however, departed from a plain reading of the statute to avoid unfairly restricting a defendant's right to confront the witnesses against him or her, as guaranteed by both the United States and New Jersey Constitutions. See State v. Budis, 125 N.J. 519, 531-32 (1991); State v. Garron, 177 N.J. 147, 153 (2003); U.S. Const. amend. VI; N.J. Const. art. 1, ¶ 10. Accordingly, our Supreme Court construed the statute to constitutionally compel evidence that is "relevant and necessary to a fair determination of the issues." Garron, 177 N.J. at 171. If the evidence is found to be relevant and necessary, then the trial court must decide whether the probative value outweighs the prejudicial effect to the victim. Budis, 125 N.J. at 532.

Under the Rape Shield Law, the probative value of sexual conduct depends on "clear proof that [the conduct] occurred, that [it is] relevant to a material issue in the case, and that [it is] necessary to a defense." State v. Perry, 225 N.J. 222, 237 (2016) (quoting State v. J.A.C., 210 N.J. 281, 300 (2012)) (alterations in original). The prejudice contemplated by the Rape Shield Law

20

includes "the trauma to the victim," whether the evidence would "invade the victim's privacy," and the "need to guard victims from excessive cross-examination and prevent undue jury confusion." Ibid. In short, in deciding whether to admit evidence of a victim's prior sexual conduct, the trial court must "weigh the relevance of the proffered evidence, its necessity to the defense, and its apparent veracity against its potential to humiliate the victim, invade her [or his] privacy, and confuse the jury." J.D., 211 N.J. at 358.

Defendant first argues that he was deprived of his rights to due process and a fair trial, specifically his right to present a complete defense, when the court denied both his pre-trial motion and his attempt to renew the motion during trial to admit evidence of J.F.'s allegations of sexual abuse against her cousin, J.L., her cousin's friend, Cory, and one of her mother's ex-boyfriends. Defendant also contends the evidence was relevant to his defenses that J.F. had "imagined or fabricated" the allegations and that J.F. had a basis of knowledge of certain sexual acts from these other incidents of sexual abuse.

In support of his first argument, defendant asserts the evidence was relevant on the issue of J.F.'s credibility because of inconsistencies between her statements to Fetcho and her statements to Waudby regarding the allegations against defendant. Defendant maintains the fact that J.F. was recounting

multiple instances of sexual abuse to Fetcho may have impacted her ability to adequately remember or explain the alleged abuse by defendant to Waudby and to the jury at trial.

Regarding the second argument, defendant cites to Budis, 125 N.J. at 533, for the proposition that the evidence was admissible to show J.F.'s knowledge of sexual acts. Defendant argues the probative value of admitting the other sexual assault allegations outweighed any prejudicial effect. We are unpersuaded.

Here, the court did not abuse its discretion in excluding evidence of J.F.'s allegations of sexual conduct concerning individuals other than defendant. In deciding the pre-trial motion, the court correctly held that the probative value of the evidence did not outweigh its prejudicial effect. The court also reasoned that the allegations lacked probative value because they concerned sexual assaults that occurred either before or after the allegations J.F. made against defendant. The court found that the evidence would be prejudicial to J.F., confuse the jury, and invade J.F.'s privacy. The court was correct in its analysis, and we discern no abuse of discretion.

Likewise, the court also properly denied defense counsel's renewed attempt to cross-examine J.F. on the prior sexual abuse allegations during the

trial.  The court noted that J.F. testified that she never had sex before defendant assaulted her and nothing in the record indicated J.F.'s knowledge of sex predated defendant's assault.  Moreover, the court determined that J.F.'s allegations of assault against the other individuals "bore no resemblance" to her allegations against defendant.  The record supports that determination.

B.

Fresh Complaint Testimony

Next, we address defendant's argument that the court erred in admitting the fresh complaint testimony.  "The determination [of] whether the fresh complaint rule's conditions of admissibility have been satisfied is committed to the discretion of the trial court."  State v. C.W.H., 465 N.J. Super. 574, 600 (App. Div. 2021) (quoting State v. L.P., 352 N.J. Super. 369, 380-81 (App. Div. 2002)).  Accordingly, an appellate court will review such a determination for an abuse of discretion, which "may be found if the trial court made a 'clear error of judgment.'"  Ibid. (quoting Brown, 170 N.J at 147).

The fresh complaint doctrine is an exception to the hearsay rule, and while such exception is not recognized under the New Jersey Rules of Evidence, our Supreme Court has recognized fresh complaint evidence under its case law.  State v. Hill, 121 N.J. 150, 165-66 (1990).  The purpose of the fresh complaint

evidence is "to prove only that the alleged victim complained, not to corroborate the victim's allegations concerning the crime." State v. R.E.B., 385 N.J. Super. 72, 89 (App. Div. 2006); Bethune, 121 N.J. at 146. At trial, fresh complaint evidence serves a narrow purpose, to negate the inference that the victim was not sexually assaulted because of her silence, and only the fact of the complaint itself is admissible. Hill, 121 N.J. at 163.

For the fresh complaint doctrine to apply, the proponent of the evidence must establish that: (1) the victim of the sexual assault disclosed the crime to a natural confidante, whom the victim would ordinarily turn to for support; (2) the disclosure was spontaneous and voluntary; and (3) the disclosure was made within a reasonable time after the alleged assault. Ibid.

In determining whether a complaint was made within a reasonable time after the act(s) occurred, the duration between the incident(s) and the reporting does not bar the statement if explainable by the youth of the victim in light of the circumstances, such as being cajoled and coerced into remaining silent by their abusers. Bethune, 121 N.J. at 143. Child victims may be reluctant to talk about sexual assault, given their limited understanding of what was done to them. State v. P.H., 178 N.J. 378, 393 (2004).

Seminal cases related to the fresh complaint doctrine acknowledge that children may be too embarrassed and scared to discuss sexual abuse, making it necessary to be flexible in the application of the fresh complaint rule for children victims of sex crimes. Bethune, 121 N.J. at 143. "A substantial lapse of time between the assault and the complaint may be permissible if satisfactorily explainable by the age of the victim and the circumstances surrounding the making of the complaint." State v. Pillar, 359 N.J. Super. 249, 281-82 (App. Div. 2003).

The length of the delay in making a disclosure does not impact the admissibility of the statement, but rather, the weight to be ascribed to the evidence. Bethune, 232 N.J. Super. 532, 535 (App. Div. 1989). Accordingly, the timeliness of the complaint and any circumstances explaining the delay are questions for the jury. Id. at 537; See State v. Balles, 47 N.J. 331, 341 (1966).

Here, defendant contends the court erred in granting the State's motion to admit C.B.'s fresh complaint testimony because J.F.'s statements to C.B. were made "at least a full year, and up to two years" after the alleged abuse by defendant. According to defendant, "these statements were not made within a reasonable time." We disagree.

Cases related to the fresh complaint doctrine have found up to three years between the sexual assault and disclosure to be reasonable. Where there are multiple instances of assault, the reasonableness of the timing of disclosure is measured from the last date of an assault. State v. W.B., 205 N.J. 588, 618 (2011). In W.B., the victim was attacked by her stepfather at age fourteen, and she later disclosed the incident at age sixteen. Ibid. Our Supreme Court concluded that the timespan was reasonable for purposes of admitting fresh complaint testimony. Id. at 619.

Our Supreme Court reasoned the victim's age at the time of the disclosure, the victim living with defendant at least part of the time in between the attack and the disclosure, and the victim being scared to report the abuse, were all contributing factors that impacted the determination of reasonableness. Ibid.; see also R.E.B., 385 N.J. Super. at 88 (concluding that the victim's disclosure regarding repeated sexual assault incidents by her own father after two years was reasonable).

In the matter under review, the court thoroughly considered all five Bethune factors before finding that J.F.'s statements to C.B. qualified as fresh complaint evidence. The court found that J.F.—who was then thirteen years old—voluntarily and spontaneously disclosed defendant's abuse to C.B., her best

26

friend and someone J.F. would naturally turn to, in J.F.'s bedroom. The court aptly considered the fact that J.F. made the disclosure two years after the alleged abuse, clearly a reasonable time frame in cases involving child victims. See e.g. C.W.H., 465 N.J. Super at 599-600, and W.B., 205 N.J. at 618-19 (holding a two-year interval between the alleged assault and the complaint was reasonable). Therefore, we are satisfied the court did not abuse its discretion in allowing C.B. to testify as a fresh complaint witness.

III.

Defendant next argues that he should not have been convicted of second-degree endangering the welfare of a child because he did not have a legal duty, nor did he assume responsibility for the care of J.F., as required under N.J.S.A. 2C:24-4(a)(1). Alternatively, defendant contends that the court erred in failing to sua sponte instruct the jury on the lesser-included offense of third-degree endangering.

Defendant's first argument addresses the statutory distinction between a second-degree and third-degree offense under N.J.S.A. 2C:24-4(a)(1), which turns on whether the defendant had "a legal duty for the care of a child or . . . assumed responsibility for the care of a child." "Our Supreme Court has

27

interpreted this provision narrowly." State v. Saad, 461 N.J. Super. 517, 523

(App. Div. 2019). N.J.S.A. 2C:24-4(a)(1) states:

> Any person having a legal duty for the care of a child
> or who has assumed responsibility for the care of a
> child who engages in sexual conduct which would
> impair or debauch the morals of the child is guilty of a
> crime of the second[-]degree. Any other person who
> engages in conduct or who causes harm as described in
> this paragraph to a child is guilty of a crime of the
> third[-]degree.

Our Supreme Court has held that the Legislature intended the second-

degree crime to apply to a person who has "assumed the care of a child," is

"living with the child," or has "a general right to exercise continuing control or

authority over" the child. State v. Galloway, 133 N.J. 631, 659 (1993); accord

Saad, 461 N.J. Super. at 524. "[A]n enhanced degree is warranted by the

'profound effect on the child when the harm is inflicted by a parental figure in

whom the child trusts.'" Saad, 461 N.J. Super. at 524 (quoting Galloway, 133

N.J. at 661).

Accordingly, the second-degree of the crime applies to those with "a

general and ongoing responsibility for the care of the child," which may "arise

from informal arrangements," so long as the actor has "established a continuing

or regular supervisory or caretaker relationship with the child that would justify

the harsher penalties." Id. at 524-25 (quoting Galloway, 133 N.J. at 661).

28

Conversely, "a person assuming only temporary, brief, or occasional caretaking functions, such as irregular or infrequent babysitting," should be charged with third-degree endangerment. Galloway, 133 N.J. at 661-62. "Questions pertaining to statutory interpretation are legal in nature," and thus the appellate court reviews such issues de novo. State v. Fuqua, 234 N.J. 583, 591 (2018).

Here, the evidence supports a finding that defendant assumed responsibility for the care of J.F, and therefore, the second-degree endangering charge was appropriate. Both J.F.'s testimony and defendant's statements established that almost every weekend for approximately five months, defendant drove J.F. round trip from Pennsylvania to Ridgewood to stay at his home without her mother. Defendant explained that he provided J.F. with meals and took her to the bowling alley and movie theatre. Defendant also provided J.F. with sleeping accommodations. That evidence established that defendant had a regular and continuing caretaker relationship with J.F. that justified the second-degree charge.

"When a defendant does not request an instruction or fails to object to its omission in the final jury charge, [the appellate court] review[s] the omission of that instruction for plain error." State v. Dunbrack, 245 N.J. 531, 544 (2021). If, as here, a defendant "did not request a charge or did not object to the omission

of a charge to a lesser[-]included offense," we assess "whether the record 'clearly indicated' the charge, such that the trial court was obligated to give it sua sponte." Id. at 545 (quoting State v. Denofa, 187 N.J. 24, 41-42 (2006)). In other words, an unrequested charge on a lesser-included offense "must be given only where the facts in evidence 'clearly indicate' the appropriateness of that charge." State v. Savage, 172 N.J. 374, 397 (2002) (quoting State v. Choice, 98 N.J. 295, 298 (1985)).

Applying these principles to the matter before us, the evidence adduced at trial did not clearly indicate the need for a third-degree endangering charge. Rather, the facts showed that defendant had assumed full responsibility for J.F.'s care when she stayed at his home over the weekends for five months. Thus, the court did not err by not sua sponte instructing the jury on third-degree endangering the welfare of a child.

## IV.

Defendant also contends that repeated instances of prosecutorial misconduct denied him the right to a fair trial. Prosecutors in criminal cases are expected to make "vigorous and forceful" arguments to juries. State v. Frost, 158 N.J. 76, 82 (1999); see also State v. Garcia, 245 N.J. 412, 435 (2021). Nevertheless, prosecutors are "obliged to confine summation remarks to the

evidence in the case and only those reasonable inferences that may be drawn from that evidence." State v. McNeil-Thomas, 238 N.J. 256, 283 (2019) (LaVecchia, J., dissenting).

Accordingly, a prosecutor's comments concerning the credibility of witnesses must be supported by the record. See State v. Smith, 167 N.J. 158, 179-82 (2001). The prosecutor should not express his or her personal opinion on a witness's credibility, but "may attempt to persuade the jury that a witness is not credible and in doing so, 'may point out discrepancies in a witness's testimony or a witness's interests in presenting a particular version of events.'" State v. Supreme Life, 473 N.J. Super. 165, 174 (App. Div. 2022) (quoting State v. Johnson, 287 N.J. Super. 247, 267 (App. Div. 1996)).

A prosecutor is also prohibited from "'cast[ing] unjustified aspersions' on defense counsel or the defense." State v. Acker, 265 N.J. Super. 351, 356 (App. Div. 1993) (quoting State v. Lockett, 249 N.J. Super. 428, 434 (App. Div. 1991)). In that regard, a prosecutor should not insinuate that a defendant is a "liar." See State v. Wakefield, 190 N.J. 397, 466 (2007); Supreme Life, 473 N.J. Super. at 174.

Defendant argues that his right to a fair trial was violated when the prosecutor made comments bolstering J.F.'s credibility and referring to

31

defendant's defense as a "mountain of lies." Defendant also contends the prosecutor improperly speculated that defendant's abuse of J.F. could have continued if D.F.'s boyfriend at the time had not closed communication between J.F. and defendant.

Defendant points to the following comments the prosecutor made in her closing statement to the jury:

> (1)   It is outrageous to believe that we are here because [J.F.] made this up.
>
> (2)   So when defense counsel talks about not corroborated, I disagree.  Because you hear from [J.F.] who I submit to you is very credible.  She tells you what happened.
>
> (3)   Right?  And then you have what I'm going to characterize because there is no other way to characterize it as the defendant's mountain of lies.  His mountain of lies corroborate what happened in Ridgewood, what the defendant did to [J.F.].
>
> (4)   She gave you what you need to convict this defendant and on top of that, you have his own statement, his mountain of lies, his attempt to deflect, his attempt to make this her fault.
>
> (5)   Ladies and gentlemen of the jury, you heard from [J.F.] and you heard the mountain of lies from the defendant.
>
> (6)   The only reason [the abuse] stopped is because [D.F.'s] current boyfriend put an end to it . . . And you know what?  To a certain extent, thank God that he did

because we had it. It could . . . the abuse still could be going on.

Defense counsel objected to the second and sixth comments and requested curative instructions, which were denied by the court. Defense counsel also moved for a mistrial because of statement six. The court denied the motion for a mistrial reasoning that the jurors are repeatedly told that any speculation or arguments made by counsel during summation are not to be considered as evidence. We review those two statements for harmful error. See State v. G.E.P., 243 N.J. 362, 389 (2020) (explaining that when a defendant objects to an alleged error at trial, the reviewing court reviews for "harmful error," which prompts an analysis of "whether in all the circumstances there [is] a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits." (quoting State v. Mohammed, 226 N.J. 71, 86-87 (2016)) (alteration in original)).

When applying the harmful error standard, the reviewing court assesses whether the alleged "error [was] 'sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached.'" State v. Jackson, 243 N.J. 52, 73 (2020) (alteration in original) (quoting State v. Prall, 231 N.J. 567, 581 (2018)).

While the prosecutor expressed her personal opinion regarding J.F.'s credibility, it is clear the prosecutor was referencing J.F.'s testimony concerning defendant's abuse in response to defense counsel's suggestion that J.F.'s testimony directly conflicted with defendant's statement to Pizzuti that he never touched or slept in the same bed as J.F.  See State v. C.H., 264 N.J. Super. 112, 135 (App. Div. 1993) (explaining that "[g]enerally, remarks by a prosecutor, made in response to remarks by opposing counsel, are harmless").  The jury drew its own conclusions regarding the veracity of J.F.'s testimony.

When reviewing a prosecutor's summation, we examine questionable comments "in the context of the entire trial" and taken as a whole.  State v. Morton, 155 N.J. 383, 419 (1998).  In that regard, we note the jury was deadlocked on both first-degree aggravated sexual assault counts involving vaginal or digital penetration, allegations that defendant consistently denied in both statements to law enforcement, which were played for the jury.

Likewise, we conclude the prosecutor's comment that defendant could have continued abusing J.F. if D.F.'s boyfriend had not intervened is also harmless error.  While it was speculative for the prosecutor to comment on the potential for defendant to continue abusing J.F., the statement is supported by

J.F.'s testimony that she stopped visiting defendant because her mother's boyfriend found it "disrespectful."

On the other hand, defendant did not object to statements one, three, four, or five. Accordingly, we review those statements for plain error. See R. 2:10-2; State v. Singh, 245 N.J. 1, 13 (2021) (explaining that "[w]hen a defendant does not object to an alleged error at trial, such error is reviewed under the plain error standard"). "[A]n unchallenged error constitutes plain error if it was 'clearly capable of producing an unjust result,'" Singh, 245 N.J. at 13 (quoting R. 2:10-2), and "raise[s] 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached,'" State v. Funderburg, 225 N.J. 66, 79 (2016) (omission in original) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)).

There was no plain error here. The State's evidence against defendant was strong. In his statement to Waudby, defendant admitted that he touched J.F.'s breasts, buttocks, and potentially her vagina. While defendant later denied ever touching J.F. in his subsequent statement to Pizzuti, J.F.'s testimony corroborated many details contained within defendant's first statement to law enforcement. Therefore, on this record, the prosecutor's comments were not clearly capable of producing an unjust result nor do they raise a reasonable doubt

as to whether the comments led the jury to a result it otherwise might not have reached. Defendant's fundamental right to a fair jury trial was not "substantially prejudiced" and the jury "fairly evaluate[d] the merits of his defense." See Wakefield, 190 N.J. at 438.

V.

Finally, we address defendant's argument that his sentence was excessive as the Yarbough analysis was inadequate and the court failed to properly find and weigh the aggravating and mitigating factors. Our review of a sentencing decision is well-established and deferential. See State v. Cuff, 239 N.J. 321, 347 (2019). We "must not 'substitute [our] judgment for that of the sentencing court.'" State v. Liepe, 239 N.J. 359, 370 (2019) (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)). Rather, we will affirm a trial court's sentence unless: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

## A.

## The Aggravating and Mitigating Factors

Defendant argues that the court erred in not finding mitigating factor seven, N.J.S.A. 2C:44-1(b)(7): "[D]efendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense." Defendant alleges that prior to the present offenses, he had only one prior indictable conviction from 1992.

The court's decision not to find mitigating factor seven is supported by the record. The court found that factor seven was applicable because defendant had a prior criminal history, however, the court acknowledged that the prior indictable conviction was "remote" and accordingly did not weigh his criminal record "very heavily."

Defendant also contends the court double counted in finding aggravating factor four, N.J.S.A. 2C:44-1(a)(4), which states: "A lesser sentence will depreciate the seriousness of . . . defendant's offense because it involved a breach of the public trust under chapters 27 and 30 of this title, or . . . defendant took advantage of a position of trust or confidence to commit the offense," as to the endangering conviction. Defendant argues that taking advantage of a position of trust or confidence is an element of the crime of second-degree endangering

37

the welfare of a child, and therefore cannot also support a finding of aggravating factor four.

"Elements of a crime, including those that establish its grade, may not be used as aggravating factors for sentencing of that particular crime." State v. A.T.C., 454 N.J. Super. 235, 254 (App. Div. 2018) (quoting State v. Lawless, 214 N.J. 594, 608 (2013)). Nevertheless, where a court sentences on multiple charges, inherent elements of one charge may be used as aggravating factors for another. See State v. Boyer, 221 N.J. Super. 387, 405-06 (App. Div. 1987). N.J.S.A. 2C:24-4(a)(1) describes the crime of second-degree endangering the welfare of a child: "Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who engages in sexual conduct which would impair or debauch the morals of the child is guilty of a crime of the second degree."

In finding aggravating factor four, the court observed that:

> [T]his was a breach of trust. This little girl, she was only [eleven] years old trusted him. The defendant knew that her mother had serious problems. He would pick her up, bring her to his home or the mother would bring her to his home, and he would sexually assault her.

38

Our Supreme Court has held "sentencing courts must avoid double-counting any element of an offense as an aggravating factor." Lawless, 214 N.J. at 601 (citing State v. Kromphold, 162 N.J. 345, 353-54 (2000)).

N.J.S.A. 2C:14-2(b) only requires that the "actor commits an act of sexual contact with a victim who is less than [thirteen] years old and the actor is at least four years older than the victim." Where a court sentences on multiple charges, inherent elements of one charge may be used as aggravating factors for another. See Boyer, 221 N.J. Super, at 405-06.

The application of aggravating factor four to the second-degree endangering the welfare of a child conviction was not improper. In this case, the court did not engage in double counting as to the sexual assault counts. The court's assessment was appropriate because unlike endangering the welfare of a child, being in a position of trust or responsibility is not an element of sexual assault under N.J.S.A. 2C:14-2(b). Therefore, a remand is not warranted.

B.

The Yarbough Analysis and the Overall Fairness of the Sentence

Next, defendant argues the court erred in ordering the sentences for count three, second-degree sexual assault for intentionally touching J.F.'s breasts, and count six, endangering the welfare of a child, consecutively to the sentence for

count five, second-degree sexual assault for intentionally touching J.F.'s vagina. Defendant asserts the court improperly assessed the factors set forth in Yarbough.

"[T]rial judges have discretion to decide if sentences should run concurrently or consecutively." State v. Miller, 205 N.J. 109, 128 (2011); see also N.J.S.A. 2C:44-5(a). "[W]hen determining whether consecutive sentences are warranted," a court is required "to perform the well-known assessment of specific criteria" commonly referred to as the Yarbough factors. State v. Randolph, 210 N.J. 330, 353 (2012). Those factors include the following:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
> > (a) the crimes and their objectives were predominantly independent of each other;
> >
> > (b) the crimes involved separate acts of violence or threats of violence;
> >
> > (c) the crimes were committed at different times or separate places, rather than being committed

so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense.

[State v. Torres, 246 N.J. 246, 264 (2021) (citing Yarbough, 100 N.J. at 643-44).]

Here, the court did not abuse its discretion in imposing consecutive sentences. The court did not, as defendant contends, solely rely on the "no free crimes" factor and the length of time the abuse lasted. Instead, the court found that defendant committed numerous sexual assaults, which involved touching different intimate parts of J.F.'s body, over a period of months. The court also found that the endangering crime was distinct from the sexual assaults.

Defendant also contends, and the State concedes, that the court failed to expressly consider the overall fairness of the sentence. "An explicit statement, explaining the overall fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding or in multiple sentencing proceedings, is

essential to a proper <u>Yarbough</u> sentencing assessment." <u>Torres</u>, 246 N.J. at 268.

Accordingly, we remand for a resentencing hearing under <u>Torres</u>.

Affirmed in part and remanded for a re-sentencing hearing. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0561-22